UNITED STATES of America, Appellee,

v.

Alex WONG, Roger Kwok, Chen I. Chung, Tung Tran, Danny Ngo, Brian Chan, Joseph Wang, Chiang T. Cheng, and Steven Ng, Defendants–Appellants.

Nos. 105–112 and 167, Dockets 92–1602, 92–1640, 92–1647 to 92–1652 and 92–1701.

United States Court of Appeals, Second Circuit.

Argued Sept. 13, 1993.

Decided Nov. 8, 1994.

Lloyd Epstein, New York City (Epstein & Weil, of counsel), for defendant-appellant Alex Wong.

Alan Drezin, Brooklyn, NY, for defendant-appellant Roger Kwok.

Michael Handwerker, New York City, for defendant-appellant Chen I. Chung.

Susan G. Kellman, New York City, for defendant-appellant Tung Tran.

Gerald Bodell, New York City, for defendant-appellant Danny Ngo.

Gail E. Laser, New York City (Shargel & Futerfas, of counsel), for defendant-appellant Brian Chan.

David A. Lewis, New York City (The Legal Aid Society, Federal Defender Services Unit, of counsel), for defendant-appellant Joseph Wang.

Charles Lavine, Forest Hills, NY, for defendant-appellant Chiang T. Cheng.

Joel Cohen, New York City, for defendant-appellant Steven Ng.

Catherine E. Palmer and Loretta Lynch, Asst. U.S. Atty., E.D. N.Y., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Emily Berger and Margaret Giordano, Asst. U.S. Attys., of counsel), for appellee.

Before: OAKES and MAHONEY, Circuit Judges, and MISHLER, District Judge.*

MAHONEY, Circuit Judge:

Alex Wong, Roger Kwok, Chen I. Chung, Tung Tran, Danny Ngo, Brian Chan, Joseph Wang, Chiang T. Cheng, and Steven Ng appeal from judgments of conviction entered on various dates in October and November 1992 in the United States District Court for the Eastern District of New York, Reena Raggi, *Judge,* after a ten-week jury trial. Each of the defendants was convicted of a substantive violation of the Racketeer Influenced and Corrupt Organizations ("RICO") provisions of the federal criminal code, *see* 18

---

* The Honorable Jacob Mishler, United States District Judge for the Eastern District of New York, sitting by designation.

U.S.C. §§ 1962(c) and 1963, and of RICO conspiracy in violation of 18 U.S.C. §§ 1962(d) and 1963. Each of the defendants except Alex Wong, Chiang T. Cheng, and Steven Ng was also convicted of one count of conspiracy to commit an assault with dangerous weapons to maintain or increase their positions in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(6).

In addition, Alex Wong was convicted of one count of conspiracy to commit murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5). Roger Kwok was convicted of one count of conspiracy to kidnap and commit murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); two counts of kidnapping and murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; two counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951; and two counts of extortion in violation of 18 U.S.C. §§ 1951 and 2.

Chen I. Chung was convicted of six counts of conspiracy to commit murder (and in one count also to kidnap) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); five counts of murder (and, as to two counts, kidnapping) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of kidnapping to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of conspiracy to use extortionate means to collect a debt in violation of 18 U.S.C. § 894; one count of using extortionate means to collect a debt in violation of 18 U.S.C. §§ 894 and 2; six counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951; and five counts of extortion in violation of 18 U.S.C. §§ 1951 and 2.

Tung Tran was convicted of two counts of conspiracy to commit murder (and in one count also to kidnap) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); four counts of murder (and, as to two counts, kidnapping) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C.

§§ 1959(a)(1) and 2; one count of conspiracy to use extortionate means to collect a debt in violation of 18 U.S.C. § 894; one count of using extortionate means to collect a debt in violation of 18 U.S.C. §§ 894 and 2; three counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951; and three counts of extortion in violation of 18 U.S.C. §§ 1951 and 2.

Danny Ngo was convicted of one count of conspiracy to use extortionate means to collect a debt in violation of 18 U.S.C. § 894, and one count of using extortionate means to collect a debt in violation of 18 U.S.C. §§ 894 and 2. Brian Chan was convicted of two counts of conspiracy to commit murder (and in one count also to kidnap) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); three counts of murder (and, as to two counts, kidnapping) to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of conspiracy to use extortionate means to collect a debt in violation of 18 U.S.C. § 894; one count of using extortionate means to collect a debt in violation of 18 U.S.C. §§ 894 and 2; two counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951; and two counts of extortion in violation of 18 U.S.C. §§ 1951 and 2.

Joseph Wang was convicted of one count of conspiracy to commit murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); two counts of murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of conspiracy to commit extortion in violation of 18 U.S.C. § 1951; and one count of extortion in violation of 18 U.S.C. §§ 1951 and 2.

Chiang T. Cheng was convicted of two counts of conspiracy to commit murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5); three counts of murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. §§ 1959(a)(1) and 2; one count of conspiracy to use extortionate means to collect a debt in violation of 18 U.S.C. § 894; and one count

of using extortionate means to collect a debt in violation of 18 U.S.C. §§ 894 and 2.

Finally, Steven Ng was convicted of one count of conspiracy to commit murder to maintain or increase his position in a RICO enterprise in violation of 18 U.S.C. § 1959(a)(5). The non-RICO crimes of which defendants-appellants were convicted generally correspond to the predicate acts that the jury found to have been proved under the two RICO counts, but several of the RICO predicate acts were not separately charged as substantive crimes, and one of the non-RICO counts has no counterpart among the RICO predicate acts.

Chen I. Chung, Chiang T. Cheng, and Steven Ng were acquitted of one count of murder to maintain or increase their position in a RICO enterprise. Tung Tran and Brian Chan were each acquitted of one count of kidnapping to maintain or increase their positions in a RICO enterprise.

The district court sentenced all defendants except Ngo and Ng principally to multiple concurrent terms of life imprisonment for their participation in offenses involving murder to maintain or increase their positions in a RICO enterprise. The court sentenced Ngo principally to concurrent terms of ten years imprisonment for his RICO and extortion offenses. Ng was sentenced principally to concurrent terms of 210 months imprisonment for his RICO violations and 120 months imprisonment for conspiracy to commit murder. Each defendant was also accorded a number of shorter sentences to run concurrently with the principal sentences. The district court imposed concurrent fines totalling $250,000 upon each defendant except Ng, who was fined $175,000.

We affirm the judgments of conviction and sentences except for the fines imposed in this case. We vacate the fines and remand for their reconsideration.

## Background

We provide only a general factual introduction to our opinion at this preliminary juncture. Further background facts will be detailed in connection with the issues to which they pertain during the discussion of those issues. Factual recitals are based upon trial testimony and other evidence that the jury could reasonably have credited in reaching the verdicts that it rendered, except that some factual recitals (relating to pretrial hearings) are based upon evidence that was presented only to Judge Raggi, and not to the jury.

The defendants were named in a thirty-count superseding indictment that charged them with membership in a racketeering enterprise known as the "Green Dragons." The Green Dragons was a violent gang that operated principally in the predominantly Chinese sections of Elmhurst and Flushing in Queens, New York. The members primarily extorted "protection" money from Chinese-run businesses, but also engaged in periodic armed robberies. They frequently employed violence to defend and expand their turf, assaulting, kidnapping, and murdering rival gang members, potential witnesses, and businessmen who refused to pay protection money. The gang amassed a sizeable arsenal of firearms with which to conduct its criminal activities. As the Green Dragons expanded its operations, its weekly intake of protection money increased from between $400–600 per week during the summer of 1989 to $1,500–1,700 per week in late 1990.

Kin Fei Wong founded the Green Dragons in the mid–1980's as an offshoot of another Asian gang known as the "Fook Ching," and was the overall "Dai Lo" or "Big Brother" of the gang. Because Kin Fei Wong spent much of his time out of the United States, he delegated day-to-day operational authority to senior gang members. The operational or "street" leader of the Green Dragons in late 1986 was a gang member known as "E.T." After E.T. was killed in November 1986 by the Tung On, a rival Asian gang, Chen I. Chung became the operational leader of the Green Dragons. Kin Fei Wong maintained regular telephone contact with Chen I. Chung, and issued directives concerning Green Dragons policy, specific places to be extorted and amounts to demand, and how to handle conflicts with rival gangs and members of the Chinese community.

The Green Dragons recruited young Asian men from schools and playgrounds in Queens. Most of the members moved out of their families' homes and into apartments or "safe houses" maintained by the gang, where they lived with other Green Dragons members under the supervision of more senior members. Senior members collected funds derived from the gang's activities, and used the funds to pay the gang's expenses and to pay salaries to younger members.

Sonny Wong, who was one of the government's primary witnesses at trial, joined the Green Dragons when he was sixteen in October 1986, shortly after Steven Ng enlisted in the gang. He and Steven Ng had been approached at their high school by several Asian gangs before they decided to join the Green Dragons. At the time Wong and Ng joined the Green Dragons, E.T. was the gang's operational leader under Kin Fei Wong; Chen I. Chung and Wing Dong Moi were two senior members. Chung and Moi instructed Sonny Wong concerning the operating rules of the Green Dragons, including that he was to follow orders and was not to speak to the police. Danny Ngo joined the gang in January 1987. Aleck Yim, another government witness, joined the Green Dragons in April 1988, after receiving the approval of gang members Alex Wong and Danny Ngo. Joseph Wang and Chiang T. Cheng joined the Green Dragons after Yim. Shortly thereafter, Tung Tran moved to New York from San Francisco and joined the gang. Brian Chan and Roger Kwok enlisted in April 1989.

Sonny Wong was second to Chen I. Chung in the Green Dragons' organizational structure, and his duties included overseeing new recruits, dealing with the gang's lawyers, collecting funds obtained through the gang's various activities, and distributing salaries. The other members of the gang carried out its program, committing acts of extortion, robbery, murder, and assault.

The arrests and indictments in this case resulted from a nine-month joint investigation conducted between March and November 1990 by the Federal Bureau of Investigation (the "FBI") and the New York City Police Department (the "NYPD"), assisted by the Nassau County Police Department. As part of their investigation, the FBI and NYPD conducted court-authorized electronic surveillance, monitoring several telephones used by the Green Dragons from August through November 1990. Through these wiretaps, the authorities learned that the Green Dragons had arranged to fight a rival gang, the White Tigers, to settle a "turf" dispute. The police arrested Chen I. Chung, Tung Tran, Brian Chan, Joseph Wang, Roger Kwok, Danny Ngo, and other members of the Green Dragons on November 19, 1990, as the gang members massed in preparation for the expected combat. Alex Wong, Chiang T. Cheng, and Steven Ng had already been incarcerated on November 19 on other charges.

Following these arrests, defendants-appellants were charged, tried, and convicted, as previously summarized. This appeal followed.

### Discussion

Defendants-appellants urge numerous grounds for reversal.[1] Tung Tran and Alex Wong argue that impermissibly suggestive pretrial identification procedures tainted identification testimony introduced at trial. Wong, Danny Ngo, and Roger Kwok contend that the district court lacked subject matter jurisdiction over them because the government failed to adhere to the requirements of the federal Juvenile Delinquency Act. Kwok maintains that in his case, the government also failed to comply with the speedy trial provision of that statute. Joseph Wang contends that the district court's instruction on the RICO "pattern" requirement did not satisfy the "operation or management" test set forth in *Reves v. Ernst & Young*, — U.S. —, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Wang and Ngo claim that under the *Reves* standard, the evidence was insufficient to support their convictions for substantive RICO and RICO conspiracy violations. Ngo argues that the evidence was not sufficient to establish that he participated in a pattern of racketeering activity under RICO. Steven

---

1. All appellants except Danny Ngo have joined in the applicable arguments of codefendants pursuant to Fed.R.App.P. 28(i). Accordingly, sponsorship is irrelevant in the case of arguments that are applicable to a number of defendants.

Ng contends that the district court should have suppressed wiretap evidence on the ground that it was not timely sealed. Chen I. Chung and Brian Chan contend that the district court improperly empaneled an anonymous jury. Wang and Chan challenge the admission of evidence of uncharged criminal activities to prove the "enterprise" requirement under RICO. Chan argues that the district court erred in admitting allegedly hearsay evidence regarding, and contests the sufficiency of the evidence implicating him in, the murder of Jin Lee Soek. Kwok, Chung, Chiang T. Cheng, and Wong argue that the district court erred in refusing to grant them downward departures in imposing their sentences. Wong, Tran, and Chan argue that because they are concededly indigent, the district court abused its discretion by imposing fines upon them.

We address each of these claims below. Other contentions, which are not separately analyzed, are summarized at the conclusion of this opinion.

### A. Identification Testimony.

■ Tung Tran[2] and Alex Wong raise separate challenges to the admission of identification testimony at trial, arguing that the testimony was tainted by pretrial identification procedures that they claim were unduly suggestive. The identifications stemmed from two incidents involving crimes committed by Green Dragons members in 1989 and 1990.

#### 1. The Tien Chiau Restaurant Homicides and Carol Huang's Identification of Alex Wong.

##### a. The Incident.

On July 16, 1989, Carol Huang and her husband Gregory Hyde had dinner at the Tien Chiau Restaurant in Flushing. After Huang and Hyde finished dinner, they approached the counter to pay the manager, but saw two young Chinese men having an "intense conversation" with the manager, and so returned to their table to wait for the manager to finish the discussion.

After hearing what they thought were firecrackers, Hyde turned and saw one of the young Chinese men with a gun in his hand, in a crouched position and shooting at the manager. Huang also saw the manager being shot. Hyde told his wife to duck under the table. As he tried to do so, Hyde was shot and fell to the floor, his legs paralyzed. After Huang saw her husband fall to the floor, she looked up and stared at the face of the young man with the gun for "[t]wo to three seconds," while he looked at her. Huang described the gunman, whom she later identified as Alex Wong, as "a very nice-looking kid with huge, extraordinary huge eyes," and approximately sixteen to seventeen years of age. Huang continued to stare at Wong for what felt "like ages," because she feared that he would shoot at her or her husband again. Finally, Wong turned away when someone at another table screamed. Huang then saw Wong shoot in the direction of the scream. Both Anthony Gallivan, another customer dining at the restaurant, and Mon Hsiung Ting, the manager of the Tien Chiau, died from gunshot wounds inflicted during this incident.

Earlier that summer, Chen I. Chung had told Sonny Wong that the manager of the Tien Chiau Restaurant had refused to pay protection money to the Green Dragons, and that he planned to have the manager killed to

---

**2.** On June 11, 1993, Susan G. Kellman filed a motion to be relieved as counsel on this appeal at the behest of her client, Tung Tran, who was dissatisfied with the brief that she had filed on his behalf. That motion was referred to this panel. In August 1993, we denied the motion on the ground that Tran's codefendants were relying on his brief pursuant to Fed.R.App.P. 28(i), but gave Tran leave to file a *pro se* supplemental brief by September 7, 1993, and indicated at oral argument on September 13, 1993 that such a brief might be filed any time within the ensuing sixty days. On August 27, 1993, this court sought clarification from Tran through Kellman regarding whether Tran wished Kellman to appear at oral argument on his behalf. Tran did not answer this query, but requested a copy of the trial transcript, which Kellman provided. To date, we have received no indication from Tran whether he wishes us to consider Kellman's oral argument, nor have we received any supplemental *pro se* brief from him. Accordingly, we have deemed Tran's appeal to be based upon the arguments advanced by Kellman at oral argument and set forth in her brief, as well as applicable arguments of his codefendants.

teach the owners of the restaurant "not to mess with the Green Dragons." Joseph Wang and Alex Wong were in charge of collecting protection money from the Tien Chiau Restaurant. The night of the incident, Chen I. Chung contacted Sonny Wong to tell him the Tien Chiau manager was dead, and instructed Sonny Wong to meet him at Chung's apartment. There Sonny Wong met with Alex Wong, Joseph Wang, and Chiang T. Cheng, who were debriefing Chung on the shooting. Cheng had driven Wang and Alex Wong to the restaurant. Alex Wong stated that he had shot the manager and a Caucasian customer. Joseph Wang said that after looking behind the cashier's counter to ascertain whether a security camera had recorded the incident, he had shot the manager again to be certain that he was dead.

### b. *Identification Procedures and Ruling Below.*

Huang provided an identification of Alex Wong as the "shooter" at the Tien Chiau Restaurant, and Wong moved unsuccessfully to suppress that evidence prior to trial. Wong claims error in the district court's adverse ruling. Given the nature of Wong's challenge, the next two paragraphs of this opinion describe primarily the testimony at the pretrial suppression hearing, which is generally consistent with the trial testimony on this issue.

Shortly after the incident, on July 25, 1989, Huang met with an NYPD sketch artist, who prepared a sketch based on Huang's description of the gunman's facial features. On September 22, 1989, Huang viewed three different photo arrays, each containing six photographs of Asian men. According to the interviewing NYPD detective, Huang chose Sonny Wong's photo from the first array and Joseph Wang's from the second, stating that their pictures "resembled" the "shooter" she had seen. She also chose Alex Wong's photo from the third array, observing that the photo "look[ed] like the shooter," and that if she saw the subject of the photograph in person she could identify him. Huang's testimony was similar to the detective's, but somewhat more tentative, and emphasized her desire to see the suspects in person.

On May 3, 1990, the NYPD conducted a lineup before Huang of six or seven Asian men, including Alex Wong. After looking at the lineup for five to ten minutes, Huang indicated that she "wasn't sure." Huang stated that one of the men (number five— Alex Wong) "look[ed] like him, but she can't be sure because of the height." The police then held a second lineup with the same participants standing, dimming the lights to simulate the lighting in the restaurant on the night of the shooting. Huang viewed the lineup for approximately five to ten minutes; just before she did so, a police detective told her that "we can't just take a 'possibly.'" Huang then identified Alex Wong. Although he was taller than she remembered the gunman to be, Huang stated that Wong had "the same facial features, fair skin, [and] rather big, huge eyes."

Based on this testimony, Alex Wong moved to suppress Huang's identification testimony, contending primarily that the detective's statement had pressured her into making an identification and thereby tainted Huang's identification of Wong. Wong also argued that there was not a sufficient independent basis for the testimony to be admissible, claiming that Huang had initially described the shooter as five feet seven inches tall, when his height was six feet two inches tall. The district court denied the motion. Although finding the detective's comment "involve[d] some element of suggestiveness," the court concluded that Huang's identification was independently reliable and that Huang would be allowed to testify at trial. At trial, Huang both made an in-court identification of Wong and testified concerning her out-of-court identification of Wong after the standing lineup.

### c. *Wong's Contentions on Appeal.*

On appeal, Wong contends that Huang's in-court and out-of-court identifications of him should have been suppressed, arguing that both the detective's comment and the fact that Wong was taller than the other participants (by six to eight inches, according to the police detective's estimate) rendered the standing lineup unduly suggestive. (Wong does not challenge the fairness of

either the photo arrays or the sitting lineup.) Wong notes that Huang testified at trial that she had never seen a photograph of him before picking him out of the standing lineup, although she had in fact done so when shown the photo arrays. Wong argues that Huang's hesitance in identifying Wong in the photo array and the seated lineup contrasts starkly with her certainty after the standing lineup, indicating that the second lineup was suggestive and that her identification was not independently reliable. Finally, Wong argues that the length of time between the shooting and the lineup—ten months— weighs heavily against a finding of independent reliability.

The Supreme Court has established a two-step inquiry for evaluating the constitutional permissibility of in-court identification testimony based on out-of-court identification procedures. That inquiry "requires a determination of whether the identification process was impermissibly suggestive and, if so, whether it was so suggestive as to raise 'a very substantial likelihood of irreparable misidentification.'" *Jackson v. Fogg,* 589 F.2d 108, 111 (2d Cir.1978) (quoting *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972) (citing *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968))).

 If pretrial procedures have been unduly suggestive, a court may nonetheless admit in-court identification testimony if the court determines it to be independently reliable. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Jarrett v. Headley,* 802 F.2d 34, 42 (2d Cir.1986). The court should consider the reliability of the identification in light of

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *see also Neil,* 409 U.S. at 199, 93 S.Ct. at 382.

For both pretrial and in-court identifications, the linchpin of admissibility is reliability. *Manson,* 432 U.S. at 106 n. 9, 114, 97 S.Ct. at 2249 n. 9, 2253. However, if impermissibly suggestive procedures are not employed, "independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury." *Jarrett,* 802 F.2d at 42 (citations omitted).

 We are not persuaded that the standing lineup was unduly suggestive. Wong does not contest the fact that the composition of the lineup, which featured a number of Asian males of similar general appearance, was fair. While the detective's comment created the risk of prompting an identification on something less than total certainty, it did not suggest that Huang choose any particular participant, nor did it confirm the correctness of her choice after it had been made. *See Jarrett,* 802 F.2d at 46 (prosecutor's statement to witness before trial to "stick to [his] guns" about identification not impermissibly suggestive because it could be, and was, taken to mean that witness should speak his mind).

Further, while lineups that unnecessarily contrast the height of a suspect with that of the other participants have been condemned as suggestive, *see, e.g., Foster v. California,* 394 U.S. 440, 442–43, 89 S.Ct. 1127, 1128–29, 22 L.Ed.2d 402 (1969); *McFadden v. Cabana,* 851 F.2d 784, 785, 789–90 (5th Cir.1988), *cert. denied,* 489 U.S. 1083, 109 S.Ct. 1541, 103 L.Ed.2d 845 (1989), we do not consider the height discrepancy to have been suggestive in this case. The circumstances of this case seem to indicate that Huang chose Wong *despite* his height, not because of it. In any event, Huang's testimony was that Wong was in a crouched position, shooting, when she observed him in the restaurant, rendering a misestimate of his height understandable without significantly undercutting the reliability of her identification.

 When the appearance of participants in a lineup is not uniform with respect to a given characteristic, the "principal question" in determining suggestiveness is whether the appearance "of the accused, *matching de-*

*scriptions given by the witness,* so stood out from all of the other[s] ... as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.'" *Jarrett,* 802 F.2d at 41 (emphasis added, alterations partially added, other alteration added in *Jarrett* ) (quoting *United States v. Archibald,* 734 F.2d 938, 940 (2d Cir.), *modified,* 756 F.2d 223 (2d Cir.1984)); *see also United States v. Jakobetz,* 955 F.2d 786, 803 (2d Cir.) (lineup not suggestive where defendant's moustache was smaller than those of other lineup participants, because witness described man with no facial hair), *cert. denied,* — U.S. —, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *Solomon v. Smith,* 645 F.2d 1179, 1182–84 (2d Cir.1981) (lineup suggestive when suspect was only person meeting description of height and weight provided by witness); *United States ex rel. Cannon v. Montanye,* 486 F.2d 263, 266–67 (2d Cir. 1973) (lineup suggestive when defendant directed to wear green sweater, witness had stated that suspect wore green shirt), *cert. denied,* 416 U.S. 962, 94 S.Ct. 1982, 40 L.Ed.2d 313 (1974); *United States v. Fernandez,* 456 F.2d 638, 641–43 (2d Cir.1972) (photo array suggestive when defendant's was only photo matching skin color described by witnesses). According to Wong, Huang initially described the gunman as approximately five feet seven or eight inches tall. Although the other lineup participants more closely fit this description, Huang chose Wong because of his facial features, commenting that he was taller than she remembered.

We conclude that neither the detective's comment, nor the height differential between Wong and the other participants in the lineup, nor the combination of these two factors rendered the lineup at which Huang identified Wong unduly suggestive. Furthermore, in any event, viewing the totality of the circumstances, *see Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *Neil,* 409 U.S. at 199, 93 S.Ct. at 382, Huang's pretrial identification was independently reliable and thus admissible.

Huang observed the gunman after she ducked under the table at the restaurant, staring him in the face for "[two] to three seconds" before he turned away. This was sufficient for identification. *See Coleman v. Alabama,* 399 U.S. 1, 4–6, 90 S.Ct. 1999,

2000–02, 26 L.Ed.2d 387 (1970) (plurality opinion) (fleeting but "real good look" at assailant sufficient for identification). Moreover, as the district court found, Huang's degree of attention was very high as she stared at the assailant's face because she feared he would open fire on her and her husband. *See United States v. Concepcion,* 983 F.2d 369, 378 (2d Cir.1992) ("nature of events" in struggle and shooting "was such as to attract and hold [the witnesses'] attention"), *cert. denied,* — U.S. —, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *Gonzalez v. Hammock,* 639 F.2d 844, 847 (2d Cir.1980) (witness' attention "would be riveted on a man who was pulling a shotgun from a bag"), *cert. denied,* 449 U.S. 1088, 101 S.Ct. 880, 66 L.Ed.2d 815 (1981).

Further, Huang worked with a sketch artist in the development of a composite sketch of the assailant that, the district court found, bore a "striking resemblance in many respects" to Alex Wong. As to certainty, Huang apparently made a tentative identification of Wong after the first lineup, but said she was "not very sure." Huang displayed no doubts after the second lineup, or in her subsequent testimony. In commenting upon Huang's testimony at the pretrial suppression hearing, the district court observed that Huang was "a person of rather strong character" who was not "easily influenced by anyone," and concluded that Huang's certainty was the result of her own independent recollection. Finally, the length of time between the crime and the confrontation (ten months before the lineup and thirty-one months before the in-court identification), while a factor militating against reliability, may be outweighed by other indicia of reliability. *See United States v. Jacobowitz,* 877 F.2d 162, 168 (2d Cir.) (ten-month interval), *cert. denied,* 493 U.S. 866, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989); *United States v. Williams,* 596 F.2d 44, 49 (2d Cir.) (thirty-two month interval), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979).

2. *The Hampton Street Robbery and Linda Pang's Identification of Tung Tran.*

a. *The Incident.*

On January 23, 1990, members of the Green Dragons robbed an apartment at 40–

15 Hampton Street in Queens, acting on a tip that the apartment was the location of an underground gambling spot. The night of the robbery, Sonny Wong met Chen I. Chung at one of the gang's apartments. Chen I. Chung said that he had sent Brian Chan, Alex Wong, Steven Ng, Joseph Wang, Chiang T. Cheng, and several others to rob the apartment; Sonny Wong believed that Chung also might have mentioned Danny Ngo or Tung Tran. The Green Dragons went to the apartment that night, and forced their entrance shortly after 11 p.m.

Once inside, the gang forced Cheng Chen (one of the apartment's occupants), his mother, and his cousin to undress, and proceeded to ransack the apartment. For the next two hours, Cheng Chen was held in one room at gunpoint, during which time he heard various sounds coming from other rooms in the apartment, including the screams of his wife, Linda Pang. After the gang members left, Chen found his wife naked and crying in another room. Pang, who was in the bathroom when the gang members entered the apartment, had been forced out of the bathroom by a gang member. For the next two hours, Pang saw approximately five or six robbers, several with guns and at least one with a knife, as she was taken at gunpoint from room to room in the apartment. While in her bedroom, Tung Tran raped Pang at knifepoint. The robbers stole cash and jewelry from the apartment, as well as Chen's ATM card and access number.

Later that night, Sonny Wong saw Danny Ngo, Joseph Wang, Alex Wong, Tung Tran, Brian Chan, and Roger Kwok at one of the gang's apartments, sorting out proceeds from the robbery of the Hampton Street apartment. Aleck Yim, who was also present at the apartment, recalled that Tung Tran, Steven Ng, Brian Chan, and "other Green Dragon [m]embers" were present and discussed the robbery.

b. *Identification Procedures and Ruling Below.*

Pang provided an identification of Tung Tran as a participant in the Hampton Street robbery, and Tran moved unsuccessfully to suppress the identification prior to trial. Be-cause Tran contends that the district court erroneously ruled, following that hearing, that Pang would be allowed to testify at trial, the next three paragraphs of this opinion address the testimony at the pretrial suppression hearing.

At the end of January 1990, Pang reviewed approximately 100 loose photographs at the police station, but did not recognize anyone in the photos from the robbery. One week later, the police brought Pang additional photos to review in her home. Pang, Chen, his mother, and a roommate took turns reviewing approximately thirty photos. Although Chen and the roommate each made an identification, Pang failed to recognize anyone from the robbery. Approximately one month later, Pang attended a police lineup of five individuals, but failed to make an identification.

On June 12, 1990, Detectives Charles Judson and Peter Blum of the Nassau County Police Department met with Chen and Pang at a coffee shop to show them photo arrays. Judson met with Chen at one table and showed him one set of photos, while Blum sat with Pang at a separate table and showed her a second set. Chen identified Tung Tran and two other participants from this set. Pang identified Brian Chan from the second set. Pursuant to instructions, Chen and Pang then signed their names to the backs of the photographs that they had identified, and initialled the backs of photographs that they had not selected. The two tables then exchanged photographs.

When Blum laid this second set of photos before Pang, she "stared" at them, "obviously fixating on one photograph and her eyes were full of tears. She began to cry." Blum put the photos away and tried to console her for two or three minutes, because "it was obvious she was reliving the incident." When Pang had composed herself, Blum again laid out the photos. Pang then pointed to a picture of Tung Tran. Blum turned the picture over and had her sign it, and then initial the remaining photographs. Pang signed above her husband's signature, which he had placed on the reverse side of the photograph after his prior identification of Tran.

One week after viewing photos in the coffee shop, Pang viewed additional photographs but did not recognize anyone. On October 18, 1990, in a meeting held at the office of one of the Assistant United States Attorneys handling this case, Detective Blum again showed Pang the photos she had viewed in the coffee shop. Pang again identified the photograph of Tung Tran.

Tran's motion to suppress Pang's identification testimony was based upon the contention that the identification procedures employed by the police were impermissibly suggestive. Because of the court's concern that Chen's signature on the back of Tung Tran's photograph might have bolstered Pang's identification, the court heard testimony from Chen and Pang, as well as Judson and Blum, about the suggestiveness of the procedures employed. Pang testified that she initially looked at the second set of pictures "for one or two minutes, and then . . . felt very uncomfortable." After she composed herself, she looked at the pictures for a "few minutes," and then identified Tran. The writing on the back of the pictures meant "[n]othing much" to her. She did not notice her husband's signature beneath her signature when she signed the back of Tran's photograph. The court also questioned Pang about the circumstances under which she had seen her assailant on the night of the robbery. Pang testified that she had seen him face-to-face and looked him "in the eye" for about a minute in "[v]ery clear" lighting.

The district court denied Tung Tran's motion to suppress Pang's identification, concluding that Pang had not been influenced by the presence of her husband's signature on the back of Tran's photo. The court said:

> In listening carefully to all of this witness' testimony on direct and cross, and also to her answers to my questions[,] I am prepared to believe her, that she didn't notice her husband's signature. This very unassuming, somewhat shy young woman finds it very difficult even now to say what happened to her the night that is at issue here that she was raped. She's prepared to discuss [that night] in almost any other terms, except when she's finally asked repeatedly to say exactly what happened to her.

> I have little difficulty believing that seeing that photograph some months after the rape renewed in her all of the horror of the experience, and that when she did turn it over to sign her name, that that would have been the kind of quick action where she wasn't particularly paying attention to any of the other names on it. I'm prepared to believe her in this regard.

At trial, Chen identified Chiang T. Cheng, Steven Ng, and Brian Chan as among the robbers that night. Pang also identified Cheng, Ng, and Chan at trial, as well as Tung Tran and Danny Ngo. Prior to trial, the defendants requested, and obtained, an *in limine* ruling to preclude the government from introducing evidence that Pang was raped during the Hampton Street robbery.

### c. *Tran's Contentions on Appeal.*

■ On appeal, Tran renews his contention that the pretrial procedure was suggestive. Tran also argues that because Pang was ordered to keep her head down by the robbers, she did not have an independently reliable basis for the identification. We disagree.

The district court's conclusion that Pang's agitation kept her from noticing her husband's signature on Tran's photo is a finding of fact based on the court's observation of the witness' demeanor, and is not clearly erroneous. Moreover, "police suggestiveness does not require the suppression of an identification if the witness was not thereby influenced, as, for example, when the witness's identification was already positive." *Jarrett,* 802 F.2d at 41–42. The evidence is undisputed that Pang identified Tran's photograph before it was turned over for her to affix her signature on the reverse side, and thus before she had any opportunity to view her husband's signature. Thus, her identification was firm before the asserted "suggestiveness" came into play.

In addition, although our conclusion that Pang's identification of Tran was not affected by any suggestive police procedure eliminates the need to inquire into the independent reliability of Pang's identification, *see*

*Jacobowitz,* 877 F.2d at 168, we note that it exhibits very strong indicia of reliability. Pang had an ample opportunity to view Tran, and the incident understandably held her full attention. *See Neil,* 409 U.S. at 200 & n. 7, 93 S.Ct. at 383 & n. 7. Pang displayed complete certainty about her identification. Under these circumstances, neither the fact that Pang had not previously provided a description of Tung Tran, nor the fact that her photo identification occurred six months after the incident (and her in-court identification twenty-five months after the incident) renders her identification unreliable. *See Jacobowitz,* 877 F.2d at 168. Finally, while Tran argues that Pang's pretrial failure to identify anyone before or after viewing the photo arrays in the coffee shop is an indication that she has no independent recollection of the robbery, it is just as likely (or more likely, given Pang's opportunity to view the intruders) to be a manifestation of extreme conscientiousness as a witness. *See Neil,* 409 U.S. at 201, 93 S.Ct. at 383.

B. *Juvenile Delinquency Act Claims.*

The Juvenile Delinquency Act (the "JDA"), 18 U.S.C. §§ 5031 *et seq.,* regulates the exercise of federal jurisdiction over juvenile defendants. Section 5032 of the JDA establishes two different certification requirements for juvenile delinquency proceedings in federal courts:

(1) a "need certification" provision, requiring certification by the Attorney General that there is a need for the proceedings to take place in federal rather than state court; and (2) a "record certification" provision, requiring delivery to the federal court of any prior juvenile court records or certification by the juvenile court that there are no such records.

*United States v. Doe,* 13 F.3d 302, 303 (9th Cir.1993).

The need certification provision directs that a juvenile alleged to have committed an act of juvenile delinquency[3] may not be prosecuted in a federal district court unless the Attorney General certifies to the court that: (1) state courts either do not have or refuse to assume jurisdiction over the juvenile; (2) the state does not have "available programs and services adequate for the needs of juveniles;" or (3) the offense charged is a violent felony, or is one of several enumerated narcotics- and firearm-related offenses, and there is a substantial federal interest in the case or the offense to warrant the exercise of federal jurisdiction. 18 U.S.C. § 5032. Certification is a prerequisite to the exercise of federal jurisdiction over juveniles. *See United States v. Baker,* 10 F.3d 1374, 1396 (9th Cir.1993), *cert. denied,* — U.S. —, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994); *United States v. Chambers,* 944 F.2d 1253, 1258–60 (6th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992); *United States v. Juvenile Male,* 923 F.2d 614, 618 (8th Cir. 1991); *United States v. Brian N.,* 900 F.2d 218, 222 n. 8 (10th Cir.1990); *United States v. Hoo,* 825 F.2d 667, 669 n. 1 (2d Cir.1987), *cert. denied,* 484 U.S. 1035, 108 S.Ct. 742, 98 L.Ed.2d 777 (1988). If the Attorney General does not certify the case, "such juvenile shall be surrendered to the appropriate legal authorities of [the] State." § 5032.

While proper certification confers jurisdiction upon the district court, it does not determine whether the government must proceed against the defendant as a juvenile, with the extra procedural protections afforded by the JDA, or as an adult in a criminal prosecution. *See id.; Chambers,* 944 F.2d at 1261. A federal district court may convene itself as a juvenile court under the JDA. *See Brian N.,* 900 F.2d at 222. When a juvenile who is not a previous offender is alleged to have committed a violent felony or one of several specified narcotics-related offenses, the Attorney General may make a motion to transfer the juvenile to adult proceedings. § 5032. This motion may be granted if, after

---

**3.** The JDA defines a "juvenile" as "a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday...." 18 U.S.C. § 5031. "Juvenile delinquency" is defined as "the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." *Id.*

a hearing, the district court finds that "such transfer would be in the interest of justice" considering, *inter alia,* the juvenile's age, background, prior delinquency record, and maturity. *Id.; see also United States v. Elwood,* 993 F.2d 1146, 1149 (5th Cir.1993). For previous offenders charged with committing crimes after the age of sixteen that involve the threat, use, or substantial risk of use of physical force, or enumerated narcotics-related offenses, transfer to the district court is automatic. § 5032.

The record certification provision specifies that:

Any proceedings against a juvenile under this chapter or as an adult *shall not be commenced* until any prior juvenile court records of such juvenile have been received by the court, or the clerk of the juvenile court has certified in writing that the juvenile has no prior record, or that the juvenile's record is unavailable and why it is unavailable.

*Id.* (emphasis added). Courts have read the mandatory language of this provision to establish the certification of records as a prerequisite to the exercise of federal jurisdiction. *See Doe,* 13 F.3d at 304; *United States v. M.I.M.,* 932 F.2d 1016, 1019–20 (1st Cir. 1991); *Juvenile Male,* 923 F.2d at 620; *Brian N.,* 900 F.2d at 222–23. Under the JDA, juvenile proceedings commence with the filing of an information. *See Doe,* 13 F.3d at 304; *M.I.M.,* 932 F.2d at 1019; *Brian N.,* 900 F.2d at 221; *In re Martin,* 788 F.2d 696, 698 (11th Cir.), *cert. denied,* 478 U.S. 1009, 106 S.Ct. 3306, 92 L.Ed.2d 719 (1986).

### 3. *Jurisdiction over Juvenile Offenses of Wong and Ngo.*

In convicting Alex Wong of substantive RICO and RICO conspiracy violations, the jury found Alex Wong had committed five predicate acts: (1) the murder and/or conspiracy to murder Mon Hsiung Ting and Anthony Gallivan at the Tien Chiau Restaurant on July 16, 1989 (racketeering act no. 2); (2) the conspiracy to murder Carol Huang, a witness to the Tien Chiau shootings, which occurred between October 1990 and November 19, 1990 (racketeering act no. 6); (3) the robbery at 40–15 Hampton Street on Janu-

ary 23, 1990 (racketeering act no. 9); (4) the extortion of the High Pearl Restaurant during the spring of 1989 (racketeering act no. 14); and (5) the bribery of a public official during August 1990 (racketeering act no. 21). Wong was also convicted of conspiring to commit murder to maintain or increase his position in a RICO enterprise for his participation in the plot to murder Carol Huang. Wong had his eighteenth birthday on October 25, 1990. With the sole exception of the conspiracy to murder Carol Huang, Wong committed all of the charged RICO predicate acts while a juvenile. Nevertheless, the government never certified this case for prosecution in the district court pursuant to the JDA or moved to have Wong transferred to adult status.

After his conviction, Wong moved to dismiss the substantive RICO and RICO conspiracy counts on the ground that he was not an adult during the commission of either crime. Wong argued that the definition of "pattern of racketeering activity," which requires "at least two acts of racketeering activity," 18 U.S.C. § 1961(5), would not support a RICO or RICO conspiracy conviction absent proof that the defendant had committed two or more predicate acts as an adult. Because the government did not move to transfer Wong's case to adult status pursuant to the JDA, Wong argued, his activities prior to his eighteenth birthday were to be deemed acts of juvenile delinquency outside the jurisdiction of the federal courts and could not constitute RICO predicate acts.

In an oral opinion rendered July 17, 1992, the district court denied Wong's motion, holding that substantive RICO and RICO conspiracy were "continuing crimes," and that Wong's commission of a single predicate act as an adult was sufficient to establish federal jurisdiction over Wong to be tried as an adult.

Similarly, in convicting Danny Ngo of substantive RICO and RICO conspiracy violations, the jury found that he had committed three predicate acts: (1) conspiracy to murder the leader of the rival gang known as the "Tung On" at the 888 Restaurant in Queens in February 1987 (racketeering act no. 7); (2) the robbery at 40–15 Hampton

Street on January 23, 1990 (racketeering act no. 9); and (3) conspiracy to commit extortion and attempted extortion of Jack Tran in August 1990 (racketeering act no. 12). Ngo did not turn eighteen until May 24, 1988, after the occurrence of the conspiracy to murder the Tung On leader. Apparently because Ngo was a juvenile at the time of this offense, a separate count of the indictment charging Ngo with participation in the conspiracy was dismissed prior to trial, although the indictment continued to include the crime as a predicate act of the RICO counts. Ngo evidently did not raise this argument before the district court. Because his argument implicates subject matter jurisdiction over his case, however, we are obliged to address it. *See Alexander v. Anheuser-Busch Cos.,* 990 F.2d 536, 538 (10th Cir.1993); *Leonhard v. United States,* 633 F.2d 599, 618 n. 27 (2d Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); Fed. R.Crim.P. 12(b)(2).

■ On appeal, Wong and Ngo contend that their acts as juveniles are not subject to federal jurisdiction absent certification by the Attorney General and a motion by the government to transfer the case to adult status pursuant to the JDA. They argue that because certain discrete offenses were completed while they were juveniles, the district court had no jurisdiction over those acts as RICO predicate acts. Wong also argues that: (1) because he did not commit two predicate acts required to establish a "pattern of racketeering," *see* § 1961(5), after his eighteenth birthday, and because the acts that he committed while a juvenile are properly considered acts of juvenile delinquency, his convictions for substantive RICO and RICO conspiracy violations must be reversed; and (2) his pre-eighteen acts did not constitute "racketeering activity," as defined in the RICO statute, because they were not "punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). For the reasons that follow, we conclude that Wong and Ngo were properly convicted on RICO counts that included predicate acts that they committed before the age of eighteen.

■ The JDA pertains to juveniles who are "alleged to have committed an act of juvenile delinquency." § 5032. "Juvenile delinquency" is defined as "the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." § 5031; *see supra* note 3. The relevant "act" for purposes of determining federal jurisdiction under § 5032 is the crime charged in the indictment—here, the substantive RICO and RICO conspiracy offenses alleged therein—rather than the discrete predicate acts underlying those charges. *Cf. United States v. Welch,* 15 F.3d 1202, 1207 n. 5 (1st Cir.1993) ("The term 'alleged act,' as used in § 5031, means the alleged offense, not each separate act comprising the offense."), *cert. denied,* —— U.S. ——, ——, 114 S.Ct. 1661, 1863, 128 L.Ed.2d 377 (1994). Thus, to procure federal jurisdiction over a case, the Attorney General must certify to the court that *the offense charged,* rather than any of the acts comprising that offense, is a crime that may be prosecuted under § 5032. *See Baker,* 10 F.3d at 1394 (general nature of charged conspiracy to distribute marijuana, rather than defendant's violent overt acts, determines whether offense was "crime of violence"). Accordingly, to determine whether the JDA governs a prosecution, a court should look to the defendant's age at the time of the offense or offenses charged in the indictment.

Wong and Ngo began committing the RICO offenses charged in counts one and two of the indictment while they were juveniles, but continued to do so after their eighteenth birthdays. Because the RICO offenses were not "committed by a [defendant] prior to his eighteenth birthday," § 5031, these offenses are not subject to the requirements of the JDA.

■ It is well established that federal courts have jurisdiction over conspiracies begun while a defendant was a minor but completed after his eighteenth birthday. "The [JDA] does not ... prevent an adult criminal defendant from being tried as an adult simply because he first became embroiled in the conspiracy with which he is charged while still a minor...." *United States v. Spoone,* 741 F.2d 680, 687 (4th Cir.1984), *cert. denied,* 469 U.S. 1162, 105 S.Ct. 917, 83 L.Ed.2d 929

(1985); *see also Welch*, 15 F.3d at 1207 n. 5 ("the [JDA] cannot be read to preclude an adult conspiracy prosecution simply because the accused's participation in the conspiracy *began* while he was under age eighteen"); *United States v. Maddox*, 944 F.2d 1223, 1233 (6th Cir.1991) ("one who enters a conspiracy prior to his eighteenth birthday can be tried as an adult if he continues in the conspiracy after that time"), *cert. denied*, — U.S. —, —, 112 S.Ct. 400, 610, 116 L.Ed.2d 349 (1991), — U.S. —, 112 S.Ct. 948, 117 L.Ed.2d 117, — U.S. —, 112 S.Ct. 1219, 117 L.Ed.2d 456, — U.S. —, 112 S.Ct. 1978, 118 L.Ed.2d 577, — U.S. —, 112 S.Ct. 2317, 119 L.Ed.2d 236 (1992), *modified*, 12 F.3d 599 (6th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1328, 127 L.Ed.2d 675 (1994); *United States v. Harris*, 944 F.2d 784, 785–86 (10th Cir.1991) (same), *cert. denied*, — U.S. —, 112 S.Ct. 903, 116 L.Ed.2d 804 (1992); *United States v. Doerr*, 886 F.2d 944, 969 (7th Cir.1989) (same) (quoting *United States v. Cruz*, 805 F.2d 1464, 1475 (11th Cir.1986) (quoting *Spoone*, 741 F.2d at 687), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204, 482 U.S. 930, 107 S.Ct. 3215, 96 L.Ed.2d 702 (1987)); *United States v. Gjonaj*, 861 F.2d 143, 144 (6th Cir. 1988) (same) (quoting *Spoone*, 741 F.2d at 687). Because conspiracy is a continuing crime that "endures until its objectives are either completed or abandoned," *United States v. Lovell*, 16 F.3d 494, 497 (2d Cir. 1994), a federal court may assume jurisdiction over a defendant " 'upon a "threshold demonstration of post-eighteen conspiracy activity." ' " *Maddox*, 944 F.2d at 1233 (quoting *Gjonaj*, 861 F.2d at 144 (quoting *Cruz*, 805 F.2d at 1476)).

This concept has been analogized to contract "ratification" doctrine: just as a minor legally incapable of entering a contract may nonetheless be found to have "ratified" a contract by taking actions after attaining majority consistent with an intent to be bound by it, *see, e.g., Leasing Serv. Corp. v. Vita Italian Restaurant, Inc.*, 171 A.D.2d 926, 927, 566 N.Y.S.2d 796, 797–98 (3d Dep't 1991); *Restatement (Second) of Contracts* § 380(1) (1981), so a defendant may ratify his pre-eighteen participation in a conspiracy by continued participation after attaining major-

ity. *See Welch*, 15 F.3d at 1211–12 (defendant's post-eighteen participation ratified pre-eighteen involvement in conspiracy); *Maddox*, 944 F.2d at 1233 (same).

■ Both substantive RICO and RICO conspiracy offenses are continuing crimes. *See United States v. Moscony*, 927 F.2d 742, 754 (3d Cir.) (substantive RICO is continuing offense analogous to conspiracy), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991); *United States v. Rastelli*, 870 F.2d 822, 838 (2d Cir.) (RICO conspiracy not complete until purposes accomplished or abandoned), *cert. denied*, 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989). It follows that Wong's conviction for conspiring to murder Carol Huang and Ngo's robbery and extortion convictions establish the requisite post-eighteen conduct to furnish the district court with jurisdiction over the substantive RICO and RICO conspiracy charges of which they were convicted.

Wong contends, however, that under the JDA he "cannot be held liable for pre-eighteen conduct," *Maddox*, 944 F.2d at 1233, and thus his pre-majority acts cannot serve as the basis for criminal liability under RICO. *See also United States v. Odom*, 13 F.3d 949, 957 (6th Cir.) (same, citing *Maddox*, 944 F.2d at 1233), *cert. denied*, — U.S. —, 114 S.Ct. 1859, 128 L.Ed.2d 481 (1994), — U.S. —, 115 S.Ct. 116, 130 L.Ed.2d 62 (1994). Because the indictment charged Wong with only one predicate act as an adult, Wong further claims that the government failed to establish the "pattern" of racketeering activity required to support a conviction for a substantive RICO or RICO conspiracy violation. These contentions are without merit.

Both *Maddox* and *Odom* affirmed convictions for conspiracies that bridged the pertinent defendant's eighteenth birthday. In *Odom*, the court decided only that evidence of pre-eighteen conduct was admissible, adding the gratuitous observation that such conduct could not support criminal liability. *See* 13 F.3d at 957. Neither case posed or addressed the RICO issue that we must address. Further, nothing in the text of the JDA would divest the district court of juris-

diction over Wong and Ngo's pre-eighteen predicate acts. This court has held that a defendant can be held criminally liable for pre-eighteen conduct so long as the prosecution begins after the defendant is twenty-one years of age, thereby precluding application of the JDA. *See Hoo*, 825 F.2d at 669–70 (collecting cases). As noted earlier, the JDA regulates jurisdiction with respect to the charged offense (here, substantive RICO and RICO conspiracy), not the individual acts comprising the offense. Thus, "once having established that certain acts of the offense occurred after the defendant's eighteenth birthday, the entire case may be tried in accordance with the adult rules of procedure and evidence." *Cruz*, 805 F.2d at 1477; *see also Welch*, 15 F.3d at 1211; *Doerr*, 886 F.2d at 969–70.

■ Further, this court has held in the statute-of-limitations context that jurisdiction over a single RICO predicate act confers jurisdiction over other predicate acts, including some that could not be prosecuted separately. Because the limitations period is measured from the point at which the crime is complete, *see United States v. Persico*, 832 F.2d 705, 713 (2d Cir.1987) (citing *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970)), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227, 488 U.S. 982, 109 S.Ct. 532, 102 L.Ed.2d 564 (1988), a defendant may be liable under substantive RICO for predicate acts the separate prosecution of which would be barred by the applicable statute of limitations, so long as that defendant committed one predicate act within the five-year limitations period. *See id.* at 714; *see also United States v. Salerno*, 868 F.2d 524, 534 (2d Cir.) (same, citing *Persico*, 832 F.2d at 714), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). Similarly, a defendant is liable for

participation in a RICO conspiracy for predicate acts the separate prosecution of which would be time-barred, so long as that defendant has not withdrawn from the conspiracy during the limitations period. *See Salerno*, 868 F.2d at 534; *Persico*, 832 F.2d at 713. While statutes of limitation are designed to serve different ends than the JDA, *cf. Welch*, 15 F.3d at 1211 & n. 12, the continuing nature of RICO offenses and the interest in avoiding multiple prosecutions for a single course of criminal conduct indicate that a similar result is warranted here.

■ Finally, Wong argues that because the government did not move to transfer his case to adult status, his pre-eighteen acts should properly have been considered acts of juvenile delinquency, and thus did not constitute "racketeering activity" as defined in the RICO statute because they were not "punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). We disagree.

Section 1961(1)(A) includes within the definition of "racketeering activity" any act or threat involving, *inter alia*, murder, robbery, extortion, or bribery "which is chargeable under State law and punishable by imprisonment for more than one year." Each of Wong's pre-eighteen predicate acts was a felony punishable under New York law by imprisonment for more than one year[4] except the extortion and conspiracy to extort the High Pearl Restaurant, which was charged under 18 U.S.C. § 1951. A person who violates § 1951 may be "imprisoned not more than twenty years." *Id.*

■ The possibility that, as a juvenile, Wong would have avoided incarceration is "wholly irrelevant," *United States v. Coonan*, 938 F.2d 1553, 1564 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992), to the question whether

---

4. The conduct underlying Wong's pre-eighteen predicate acts satisfy the elements of the following crimes under New York law, carrying the specified potential sentences: second degree murder (for the Tien Chiau Restaurant murders), a class A–I felony, *see* N.Y.Penal Law § 125.25, fifteen years to life; second degree conspiracy (for the conspiracy underlying the Tien Chiau Restaurant murders and the conspiracy to murder Carol Huang), a class B felony, *see id.*

§ 105.15, six to twenty-five years; first degree robbery (Hampton Street robbery), a class B felony, *see id.* § 160.15, one to twenty-five years; fourth degree conspiracy (Hampton Street robbery), a class E felony, *see id.* § 105.10, one to four years; third degree bribery (bribery of a public official), a class D felony, *see id.* § 200.00, one to seven years. *See generally id.* § 70.00 (establishing sentences).

the underlying conduct satisfies the definition of racketeering activity set forth in § 1961(1)(A). The statutory definition is met if the charged conduct *generally* is punishable by one year of incarceration under state law. *See Coonan,* 938 F.2d at 1564 (§ 1961(1)(A) "merely describes the type of generic conduct which will serve as a RICO predicate and satisfy RICO's pattern requirement."); *United States v. Friedman,* 854 F.2d 535, 566 (2d Cir.1988) ("New York's rules governing double jeopardy and consecutive sentencing do not affect the generic definition of the crime of bribery."), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); *United States v. Paone,* 782 F.2d 386, 393 (2d Cir.1986) ("The [RICO] statute is meant to define, in a more generic sense, the wrongful conduct that constitutes the predicates for a federal racketeering charge."), *cert. denied,* 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987).

We conclude that the defendant's age at the time the substantive RICO or RICO conspiracy offense is completed is the relevant age for purposes of the JDA, and that an adult defendant may properly be held liable under RICO for predicate offenses committed as a juvenile. Accordingly, the district court properly had subject matter jurisdiction over the substantive RICO and RICO conspiracy counts that incorporated the predicate acts committed by Wong and Ngo as juveniles.

### 4. Transfer of Roger Kwok's Juvenile Court Records.

Roger Kwok was arrested on November 19, 1990. Because he was then only seventeen years old (he was born April 5, 1973), the government charged him in a separate juvenile complaint with conspiracy to commit murder and assault with a dangerous weapon in aid of racketeering. At the same time, the United States Attorney certified that the crimes charged against Kwok were violent felonies and that there was a substantial federal interest in the case to warrant the exercise of federal jurisdiction. *See* § 5032. Kwok was arraigned on the juvenile complaint on November 20, 1990, before Magis-

trate Judge John L. Caden in the Eastern District of New York.

Before the arraignment, Pretrial Services presented the court, Kwok, and the government with a pretrial services report which recited that in August 1989, Kwok had been convicted of grand larceny in state court and sentenced to five years probation. The government further discussed the prior convictions during Kwok's November 26, 1990 detention hearing before Magistrate Judge Allyne R. Ross.

On December 19, 1990, the government filed a juvenile information against Kwok charging him with attempt to commit assault with a dangerous weapon to maintain or increase his position in a criminal enterprise, the Green Dragons, in violation of 18 U.S.C. § 1959(a)(6). The same day, the government filed a motion to transfer Kwok's case to adult status for criminal prosecution. On January 7 and 8, 1991, the government filed its memorandum of law and affidavit, respectively, in support of its motion to transfer. The memorandum detailed Kwok's prior convictions in arguing that transfer to adult status might be mandatory in his case under § 5032.

On January 11, 1991, the district court held a conference to address whether the government had properly filed the juvenile information and whether Kwok would be transferred to adult status. At that conference, the government provided the court with a certified copy of the records regarding Kwok's prior state court conviction. The court then arraigned Kwok on the juvenile information. After examining the court records firsthand at the state court, defense counsel subsequently conceded that Kwok's prior conviction was for a violent felony. The trial court then determined that the transfer of Kwok to adult status was mandatory.

Kwok argues that the government did not comply with the requirement of § 5032 that "proceedings against a juvenile under this chapter shall not be commenced until any prior juvenile court records of such juvenile have been received by the court." Essentially, Kwok contends that use of the term "prior

juvenile court records" in § 5032 mandates the delivery of official court records prior to the filing of the information.

While the language of the record certification provision of § 5032 is amenable to a strict interpretation, *see, e.g., Doe,* 13 F.3d at 304–05 (certification by assistant United States Attorney that government knew of no prior juvenile court record pertaining to defendant, rather than certification by clerk of juvenile court, failed to satisfy jurisdictional requirement), most courts have read the records certification provision to require only good faith efforts by the government to provide the court with documentation of a juvenile's prior record (or to the effect that no such record exists or is available).

In *United States v. Parker,* 956 F.2d 169 (8th Cir.1992), the Eighth Circuit concluded that certification from a state court judge and several assistant district attorneys from various jurisdictions stating that the juvenile had no prior record satisfied the record certification provision, although the language of the statute calls for such certification to be made by "the clerk of the juvenile court." The court stated: "[W]e decline to stand on technicalities. We hold that the government adequately complied with the statutory requirements of section 5032...." *Id.* at 170.

Courts have similarly demonstrated flexibility with respect to the requirement for need certification. *See United States v. Gonzalez–Cervantes,* 668 F.2d 1073, 1077–78 (9th Cir.1981) (need certification stating that San Diego County refused to assume jurisdiction over case, when certification should have concerned Imperial County, where crime occurred, did not deprive court of jurisdiction, although mistake constituted "substantive inaccuracy"); *United States v. Dennison,* 652 F.Supp. 211, 213 (D.N.M.1986) (failure to certify, in accordance with § 5032, that "substantial federal interest" existed in case did not deprive court of jurisdiction because juvenile information filed same day revealed gravity of offense and that federal jurisdiction was exclusive).

The cases cited by Kwok are not to the contrary. In *M.I.M.,* the First Circuit held that proceedings may not commence against a juvenile "until the court receives *at least a good faith proffer* of the juvenile records, or a certificate as to their absence or unavailability." 932 F.2d at 1019 (emphasis added). The court found dismissal of the proceedings appropriate, however, because *no* juvenile records "were delivered to the district court until the morning of the suppression hearing in th[at] case." *Id.* In *Juvenile Male,* there was an entire failure to comply with the record certification requirement. 923 F.2d at 620. Similarly, in *Brian N.,* the Tenth Circuit found dismissal appropriate when the government "failed to make *any effort* to provide the records to the court at the time the information was filed," although the government "knew of the existence of these juvenile defendants' court records." 900 F.2d at 223 (emphasis added).

The record certification provision should be read to afford the government a limited amount of flexibility. Such a reading is especially appropriate in view of the provision's legislative history. The record certification provision was added to § 5032 in 1984, as part of the Comprehensive Crime Control Act of 1984. *See* Pub.L. No. 98–473, § 1201(c), 98 Stat. 1837, 2150 (1964). The Senate Report describing this new section commented:

> In many respects, determination of whether a young offender is to be treated as a juvenile or an adult and of the appropriate disposition of juveniles adjudicated delinquent depends on the nature of the juvenile's prior record. Too often, however, juvenile proceedings are undertaken without the benefit of such information. This new paragraph stresses that these records be obtained beforehand whenever possible. The Committee intends, however, that this new provision's requirements are to be understood in the context of a standard of reasonableness. Thus, if reasonable efforts to obtain a juvenile's records have been made, certification of their unavailability is permissible. Also, the Committee intends that this new requirement be applied with a degree of flexibility so that stages of proceedings to which such records are not relevant are not delayed pending arrival of the records. Thus, it is appropriate that a hearing concerning a

transfer for prosecution await the arrival of a juvenile's court records, since they are highly relevant to the transfer decision. However, it would also be appropriate to commence delinquency proceedings (provided the government had not moved for a transfer for prosecution) but stay the subsequent dispositional hearing pending receipt of the records by the court, since such records are relevant to the proper disposition of the offender, but not to the initial delinquency adjudication.

S.Rep. No. 225, 98th Cong., 2d Sess. 391 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3531.

We conclude that the requirements of the record certification provision have been satisfied in this case. The government provided the court below with notice of Kwok's juvenile record (in the form of a pretrial services report) prior to arraignment, and long before the information was filed. Further, the government provided the district court with a certified copy of the juvenile court records prior to the court's determination of the government's motion to transfer Kwok to adult status. Kwok does not argue that he was prejudiced by the delay in the introduction of the official records. *Cf. Parker*, 956 F.2d at 170 ("We note that [the defendant] was not prejudiced by the district court's finding that no juvenile records exist because this finding militates against transfer."). Although the government should always endeavor to supply the district court with official juvenile court records prior to the filing of an information, we conclude that the government adequately complied with the requirements of § 5032, and the district court had subject matter jurisdiction over the case against Kwok.

5. *Kwok's Speedy Trial Claim under the JDA.*

The Juvenile Delinquency Act incorporates a speedy trial provision, which provides in relevant part that:

If an alleged delinquent who is in detention pending trial is not brought to trial within thirty days from the date upon which such detention was begun, the information shall be dismissed ..., unless the Attorney Gen-

eral shows that additional delay was caused by the juvenile or his counsel, or consented to by the juvenile and his counsel, or would be in the interest of justice in the particular case. Delays attributable solely to court calendar congestion may not be considered in the interest of justice. 18 U.S.C. § 5036.

Kwok was detained overnight after his arrest on November 19, 1990. Magistrate Judge Caden entered a formal order of detention on November 20. On December 26, 1990, Kwok filed a motion to dismiss for failure to comply with § 5036, styled as a "cross-motion" in response to the government's December 19 motion to transfer Kwok to adult status. At a status conference on January 11, 1991, Judge Raggi heard oral argument on Kwok's motion. Kwok argued that because he had not been brought to trial within thirty days of his detention, his case should be dismissed. The government responded that: (1) delays prior to the filing of the motion to transfer were not culpable because they were caused by the Justice Department's review of Kwok's case to decide whether certification for federal prosecution was appropriate; and (2) the motion to transfer Kwok to adult status tolled the speedy trial clock.

The district court rejected the government's first proffered justification, stating that: "The defendant has the right to be treated by the executive branch as required by [the JDA]." The court then concluded, however, that the government had filed its transfer motion on the twenty-ninth day of the speedy trial period, and that the government's transfer motion tolled the speedy trial clock under the "interest of justice" exception set forth in § 5036. The court implicitly concluded that the speedy trial clock began to run upon the defendant's first appearance before a judicial officer (here, after arraignment on the complaint on November 20, 1990), as is the case under the Speedy Trial Act. *See* 18 U.S.C. § 3161(c)(1).

On appeal, Kwok renews his argument, contending that: (1) the speedy trial clock begins running from the time a defendant is incarcerated, not the time he first appears before a judicial officer, and thus the govern-

ment's motion was made on the thirtieth day of the period; and (2) the government's motion was inadequate to toll the speedy trial clock, because the government merely filed a bare notice of motion that failed to set forth any facts that could serve as the basis of a valid transfer under § 5032, thereby engaging in "stalling tactics."

■ Kwok is correct that the thirty-day speedy trial period begins to run on the date a juvenile is taken into federal custody. *See United States v. Romulus,* 949 F.2d 713, 716 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1690, 118 L.Ed.2d 403 (1992); *United States v. Doe,* 882 F.2d 926, 927–28 & n. 3 (5th Cir.1989); *United States v. Doe,* 642 F.2d 1206, 1207–08 (10th Cir.), *cert. denied,* 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981); *United States v. Sechrist,* 640 F.2d 81, 83–85 (7th Cir.1981). *But see United States v. Andy,* 549 F.2d 1281, 1283 (9th Cir.1977) (period begins to run on earlier of date government certifies or should have certified case for prosecution in federal court, or date upon which government formally assumes jurisdiction over juvenile). This determination calls only for a one-day correction, however, with the result that the government filed the motion to transfer on the thirtieth day of Kwok's detention.

■ The period of time between December 19, 1990, when the government moved to transfer Kwok, and January 31, 1991, when the district court determined that transfer to adult status was mandatory because of Kwok's prior larceny convictions, was properly excluded as in the interest of justice. *See Romulus,* 949 F.2d at 716 (period between filing motion to transfer and district court's favorable decision "properly excluded under the interest-of-justice exclusion"); *cf. Baker,* 10 F.3d at 1397 (upholding determination that government's motion to continue trial date was "in the interest of justice"); *United States v. J.D.,* 525 F.Supp. 101, 107 (S.D.N.Y.1981) (period after filing motion to transfer to adult status excludable under Speedy Trial Act, 18 U.S.C. § 3161(h)(1)(F)). Once the district court had granted the motion, Kwok was no longer "an alleged delinquent" for purposes of the JDA,

and thus § 5036 was no longer applicable to him. *See Romulus,* 949 F.2d at 716.

Nothing in either the Federal Rules of Criminal Procedure or the Criminal Rules of the Eastern District of New York suggests that a motion would not be deemed filed on the date the notice of motion is filed. *See* Fed.R.Crim.P. 47 (motion "may be supported by affidavit"); E.D.N.Y.Crim.R. 3(b) (notice of motion and "any supporting affidavits" to be filed with clerk). Further, we perceive no record support for Kwok's argument that the government did not make the motion in good faith. Indeed, the district court stated that the government had proceeded "in a reasonably expeditious manner," and had presented a "serious" motion to transfer.

We conclude that the speedy trial provision of the JDA was not violated, and that the district court therefore did not err in refusing to dismiss the case.

*C. Adequacy of Jury Instructions and Sufficiency of Evidence Supporting RICO Charges under Reves v. Ernst & Young.*

All defendants-appellants were convicted of violating 18 U.S.C. § 1962(c) and (d). Section 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, *to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs* through a pattern of racketeering activity or collection of unlawful debt.

*Id.* (emphasis added). Section 1962(d) renders it unlawful for any person "to conspire to violate" § 1962(c).

Joseph Wang and Danny Ngo contend that in light of *Reves v. Ernst & Young,* —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1992), which was decided during the pendency of this appeal, the jury instruction explicating the language of § 1962(c) that is emphasized in the above quotation requires reversal. This argument would benefit all defendants-appellants, since all were convicted of violations of § 1962(c) and (d). *See supra* note 1. Wang and Ngo also claim that the evidence

was insufficient to convict them under the *Reves* standard.

*Reves* addressed the RICO liability of the outside auditor for a farmer's cooperative regarding an excessive evaluation of the cooperative's assets in the cooperative's financial statements. The Court ruled that the auditors were not liable under § 1962(c), *see* —— U.S. at ——— – ———, ———, 113 S.Ct. at 1168–69, 1174, and held "that 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Id.* —— U.S. at ———, 113 S.Ct. at 1173. The "operation or management" standard was deemed to express the "requirement" that a § 1962(c) defendant play "*some* part in directing the enterprise's affairs." *Id.* —— U.S. at ———, 113 S.Ct. at 1170.

The court added that "liability under § 1962(c) is not limited to upper management," *id.* —— U.S. at ———, 113 S.Ct. at 1173, because: "An enterprise is 'operated' not just by upper management but also by lowerrung participants in the enterprise who are under the direction of upper management." Adverting to discussion at oral argument concerning "low-level employees," *id.* —— U.S. at ———, 113 S.Ct. at 1173 n. 9, the Court stated: "We need not decide in this case how far § 1962(c) extends down the ladder of operation because it is clear that [the outside auditor] was not acting under the direction of the Co-op's officers or board." *Id.*

The challenged jury instruction in this case addressed the requirement of § 1962(c) that a defendant "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" as follows:

This requires proof that there is a meaningful connection between the defendant's illegal acts and the affairs of the enterprise. The government is not required to prove that the defendant participated in the management or control of the enterprise or that he shared in its profits. The government is, however, required to prove that the defendant knowingly and intentionally engaged in racketeering acts in some way related to the affairs of the enterprise or that the defendant was able

to commit the racketeering acts solely by virtue of his position or involvement in the affairs of the enterprise.

Wang argues that this charge impermissibly reflects the standard propounded by this circuit in *United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981), and that *Scotto* has been overruled by *Reves.* In *Scotto,* we stated that:

We think that one conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise.

*Id.* Although *Reves* does not mention *Scotto,* "we have recently recognized that the Supreme Court's holding in *Reves* ... is irreconcilable with the relevant portion of our decision in *Scotto.*" *United States v. Viola,* 35 F.3d 37, 40 (2d Cir.1994) (citing *Napoli v. United States,* 32 F.3d 31, 34 (2d Cir.1994).

The instruction challenged in this case is vulnerable as echoing *Scotto,* although it focuses on different § 1962(c) language than does *Scotto.* We have addressed similar instructions in the aftermath of *Reves* in *United States v. Thai,* 29 F.3d 785 (2d Cir.1994), *cert. denied,* —— U.S. ———, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994), *Napoli,* and *Viola.*

In *Thai,* we rejected a challenge to the conviction and underlying instruction because the challenging defendant "was not at the bottom of the management chain" and was thus included within the "ladder of operation" to which § 1962(c) extends. *Id.* at 816. We then added the following:

In any event, we note that no defendant objected to the trial court's RICO instruction in this regard, and thus we would not reverse on account of any error in light of the later-decided *Reves* unless it were plain error. *See United States v. Weiner,* 3 F.3d 17, 24 (1st Cir.1993) (reviewing § 1962(c) charge only for plain error because "*Reves* resolved a split between circuits ... so the objection could easily have

been made at trial"); *see generally United States v. Tillem*, 906 F.2d 814, 825 (2d Cir.1990) (applying plain-error standard even when error in the instruction was established only by a decision rendered after the date of the trial); *United States v. Scarpa*, 913 F.2d 993, 1019–20 (2d Cir. 1990) (same). Plain error is error so egregious as to result in a miscarriage of justice. *See, e.g., United States v. Tillem*, 906 F.2d at 825. If there was error in these instructions, it surely was not plain error. *Id.; cf. Napoli*, 32 F.3d at 37 (defendants "could have brought to this Court's attention that other circuits disagreed with our analysis in *Scotto* and that the Supreme Court had granted certiorari in *Reves* to resolve the split among the circuits on the construction of section 1962(c)").

Certiorari was granted in *Reves* on February 24, 1992, well before the commencement of the trial of this case. *See Reves*, —— U.S. ——, 112 S.Ct. 1159 (1992). No objection was taken at trial to the instruction challenged on this appeal. Wang asserts, however, that he requested a charge "that conducting or participating in the enterprise involved participation in the 'ongoing management or operation of the enterprise.'" This instruction was proposed as an elaboration of the court's instruction regarding the § 1962(c) "pattern of racketeering activity." While the proposed instruction made reference to the relationship of predicate acts to the "management or operation" of a RICO enterprise, there is no claim or showing that the proposed instruction was accompanied by an objection to the instruction challenged on appeal, and the proposed instruction did not focus upon the *Reves* issue.

Fed.R.Crim.P. 30 provides that: "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Applying this rule, we have made it clear that a "defendant's ' "requested instructions do not substitute for specific objections to the court's instructions." ' " *United States v. Locascio*, 6 F.3d 924, 942 (2d Cir.1993) (quoting *United States v. Tannenbaum*, 934 F.2d 8, 14 (2d Cir.1991) (quoting *United States v. Graziano*, 710 F.2d 691, 696 n. 8 (11th Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984))), *cert. denied*, —— U.S. ——, ——, 114 S.Ct. 1645, 1646, 128 L.Ed.2d 365 (1994). Accordingly, we do not regard Wang's proposed instruction as satisfying the requirements of Rule 30.

In *Viola*, departing in this respect from *Thai* and *Napoli*, we applied a "modified plain error rule" because *Reves* was deemed a "supervening Supreme Court decision overturning settled circuit precedent [i.e., *Scotto*]." *Viola*, 35 F.3d at 42. We understand the concerns implicit in *Viola*, for it is unclear what purpose is served by a rule requiring a party to object in district court to an instruction that is required by settled circuit precedent simply because the Supreme Court has undertaken to review the instruction. That is, until the Supreme Court rules otherwise, the district court would be obliged to follow our precedent, even if that precedent might be overturned in the near future.

In any event, it is clear that the convictions in this case should be affirmed whether normal plain error analysis or the *Viola* "modified plain error" rule is applied. The impact of that rule is to shift the burden to the government to establish that the challenged instruction did not affect the defendant's substantial rights, *see id.*, i.e., did not result in " 'a miscarriage of justice which denied the defendant a fair trial.' " *United States v. Scarpa*, 913 F.2d 993, 1020 (2d Cir.1990) (quoting *United States v. Civelli*, 883 F.2d 191, 194 (2d Cir.), *cert. denied*, 493 U.S. 966, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989)). For the reasons that follow, we are satisfied that the government has met this burden.

Defendants-appellants were all intimately involved in the criminal activities of the Green Dragons. Indeed, they were required to leave their homes and take up residence in apartments with their gang compatriots as a condition of acceptance in the organization. *Reves* makes it clear that a defendant can act under the direction of superiors in a RICO enterprise and still "participate" in the oper-

ation of the enterprise within the meaning of § 1962(c). *See Reves,* —— U.S. at —— & n. 9, 113 S.Ct. at 1173 & n. 9.

In *Viola,* the only case in which we have reversed a RICO conviction for plain error on account of *Reves,* the acquitted defendant had no awareness of the overall criminal activities of the RICO enterprise, and was described as "not on the ladder [of operation of the RICO enterprise] at all, but rather, as [the principal's] janitor and handyman, ... sweeping up the floor underneath it." *Viola,* 35 F.3d at 43.

By contrast, all the defendants-appellants in this case were thoroughly indoctrinated participants in the criminal activities of the Green Dragons. The two who have challenged the sufficiency of the evidence to support their RICO convictions in light of *Reves,* Ngo and Wang, had been active members of the Green Dragons since January 1987 (Ngo) and the spring of 1988 (Wang) at the time of their apprehension on November 19, 1990. All of the defendants-appellants were found to have committed a range of predicate acts, and were convicted of one or more crimes at the core of the criminal activities of the Green Dragons, in addition to their RICO convictions.

Joseph Wang was responsible with Alex Wong for collecting extortion money from various restaurants; when the manager of the Tien Chiau Restaurant refused to pay, Wang, along with Wong, was responsible for killing him. After the killing, Wang "moved up the ladder" in the gang, and began planning crimes. Danny Ngo was responsible for operating one of the gang's apartments and controlling the activities of the seven or eight gang members who lived there.

Alex Wong collected extortion money from restaurants, shot the manager of the Tien Chiau Restaurant, and helped organize the effort to locate the witness who had identified him in the shooting. Tung Tran instructed other members of the Green Dragons to murder Tina Sham, who had testified against a Green Dragons member at a preliminary hearing in state court, and Tommy Mach, who happened to be with Tina Sham when the Green Dragons apprehended her. Brian Chan drove one of the gang's cars, participated in kidnapping Tina Sham and Tommy Mach, and instructed another Green Dragons member to "beat up" members of the White Tigers gang. Chen I. Chung was the gang's street leader.

Roger Kwok, Chiang T. Cheng, and Steven Ng, although lower in the gang's hierarchy, operated under the direction of their superiors over an extensive period of involvement in the affairs of the Green Dragons. Kwok carried out the murders of Tina Sham and Tommy Mach. Cheng was convicted of three murders in connection with the gang's activities. Ng was convicted of a conspiracy to commit murder in furtherance of the Green Dragons' operations.

In view of this intensive and continuing involvement in the operations of the Green Dragons, ordinarily (as in the case of most criminal organizations) under the overall direction of the enterprise's leadership, we perceive no miscarriage of justice in the RICO convictions in this case. We therefore conclude that *Reves* poses no bar to affirmance of the RICO convictions rendered in this case. Nor is there any basis to regard the trial evidence as insufficient to support the RICO convictions of Wang and Ngo.

**D.** *Sufficiency of the Evidence to Establish a Pattern of Racketeering.*

Ngo contends that his many predicate acts were too widely separated in "time [and] subject matter" to constitute a § 1962(c) "pattern of racketeering activity." This argument is frivolous. To establish that predicate acts are sufficiently "related" and "continuous" to establish a "pattern of racketeering activity" under § 1962(c), *see H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239–43, 109 S.Ct. 2893, 2900–03, 106 L.Ed.2d 195 (1989), it is only necessary that the criminal acts " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)) (now repealed).

The predicate acts that the jury found to have been proved against Ngo were

conspiracy to murder a Tung On leader in February 1987, conspiracy to commit and commission of the Hampton Street armed robbery in January 1990, and conspiracy to extort and attempted extortion in August 1990. While Ngo's activities varied in type, all were designed to earn money for, or increase the prestige of, the Green Dragons, all involved the same cast of characters, and all continued for a sustained period. This evidence would easily permit a jury to find a § 1962(c) pattern of racketeering activity.

E. *Suppression of Evidence from Electronic Surveillance.*

As part of the investigation of the Green Dragons, the FBI and NYPD engaged in a series of court-authorized wiretaps that monitored calls to and from several telephones used by members of the Green Dragons. On appeal, Steven Ng argues that the district court should have suppressed tapes obtained pursuant to the wiretaps because they were not timely sealed, as required by 18 U.S.C. § 2518(8)(a).[5]

Two of the court orders at issue authorized wiretaps until December 1990. After the Green Dragons were arrested on November 19, 1990, the related tapes were sealed on November 23, 1990 (the "November 23 Tapes"). The third disputed order expired on November 11, 1990. The related tapes were sealed on November 14, 1990 (the "November 14 Tapes").

Invoking *United States v. Ojeda Rios,* 495 U.S. 257, 263–67, 110 S.Ct. 1845, 1849–52, 109 L.Ed.2d 224 (1990) (unjustified delay in sealing tapes bars their use as evidence), Ng argues that the delays in this case should have barred admission of the wiretap evidence. This court has held that a sealing " 'within one or two days' " will normally be deemed immediate within the meaning of § 2518(8)(a), *United States v. Maldonado–Rivera,* 922 F.2d 934, 949 (2d Cir.1990) (quoting *United States v. Vazquez,* 605 F.2d 1269, 1278 (2d Cir.1979), *cert. denied,* 444 U.S. 981,

100 S.Ct. 484, 62 L.Ed.2d 408 (1979), 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1980)), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984, 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991), and that longer delays require suppression "unless the government furnishes an explanation for the delay that is 'satisfactory' within the meaning of the statute." *Id.; see supra* note 5. Where the delay is between two and five days, we have indicated that the government should submit with the tapes an *in camera* explanation for the delay, *see United States v. Massino,* 784 F.2d 153, 158 (2d Cir.1986), although an explanation submitted at the time of a defendant's motion to suppress will be considered. *See United States v. Pitera,* 5 F.3d 624, 627 (2d Cir.1993), *cert. denied,* ⸺ U.S. ⸺, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994).

■ As previously noted, the authorizing order for the November 14 Tapes expired on November 11, 1990. Monday, November 12 was Veterans' Day, a legal holiday. The tapes were thus sealed within two business days of the expiration of the authorizing order. We have recognized that weekends and holidays present legitimate obstacles to the sealing of tapes. *See, e.g., United States v. Gallo,* 863 F.2d 185, 193 (2d Cir.1988), *cert. denied,* 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989); *United States v. McGrath,* 622 F.2d 36, 42–43 (2d Cir.1980). Because the sealing of the November 14 Tapes was delayed only two business days and there was no suggestion of bad faith, deliberate disregard of the statute, or tampering, there was no basis for their exclusion. *See Pitera,* 5 F.3d at 626; *Gallo,* 863 F.2d at 193.

■ With respect to the November 23 Tapes, Ng argues that the arrest of the defendants-appellants should have triggered the government's obligation to seal the tapes because 18 U.S.C. § 2518(5) precludes inter-

---

**5.** Section 2518(8)(a) provides in pertinent part: Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.... The presence of the seal provided for by this subsec-

tion, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom....

ception "for any period longer than is necessary to achieve the objective of the authorization." We believe that Judge Raggi properly decided this issue in favor of the government when it was presented below. As the district court noted, a "number of individuals who were targets of this investigation" were not apprehended on November 19, 1990, and thus the objective of the surveillance had not yet been attained on that date. *See United States v. Badalamenti,* 794 F.2d 821, 824–25 (2d Cir.1986) (authorized period did not end with last interception because government intended to resume monitoring wiretap during authorized period if its ongoing investigation indicated need to do so). The same rationale applies here. In any event, one of the intervening days between November 19 and November 23 was Thanksgiving Day, so the November 23 Tapes were filed on the third business day following the November 19 arrests. No case is made for their suppression on this record.

### F. *Anonymous Jury.*

Prior to trial, the government moved for the empanelling of an anonymous jury. In support of its motion, the government argued that the evidence presented at trial would establish that the Green Dragons were a violent gang with a history of interfering with the judicial process, that gang members continued to seek to silence potential witnesses against them, and that press coverage of the case would be extensive. The district court granted the motion over the defendants' objection, concluding that the reasons proffered by the government were sufficient to warrant the use of an anonymous jury. Accordingly, the district court limited voir dire so as not to disclose the names, addresses, or places of employment of members of the venire, kept jurors together at the courthouse during luncheon recesses, and had jurors transported to and from the courthouse.

Chen I. Chung and Brian Chan contend that the district court's decision to empanel an anonymous jury interfered with their ability to conduct voir dire and to exercise peremptory challenges in a meaningful manner, thus violating the Sixth Amendment right to an impartial jury. They further argue that the court failed to take precautions to ensure that the jurors did not infer that their anonymity was necessitated by the dangerousness of those on trial, thus violating their Fifth Amendment right to the presumption of innocence. We are not persuaded.

■ Empanelling an anonymous jury undoubtedly has serious implications for a defendant's interest in effectively conducting voir dire and in maintaining the presumption of innocence. *See United States v. Thomas,* 757 F.2d 1359, 1363–64 (2d Cir.1985), *cert. denied,* 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985), 479 U.S. 818, 106 S.Ct. 67, 88 L.Ed.2d 54 (1986). We have nevertheless recognized that because fears of retaliation may affect the jury's ability to render an impartial verdict, "[j]ustice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken." *Id.* at 1364; *see also Thai,* 29 F.3d at 801; *United States v. Amuso,* 21 F.3d 1251, 1264 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 326, 130 L.Ed.2d 286 (1994). These competing individual and institutional interests are reasonably accommodated, and the use of an anonymous jury is constitutional, when there is "strong reason to believe the jury needs protection" and the district court "tak[es] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991) (collecting cases), *cert. denied,* —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992); *see also United States v. Vario,* 943 F.2d 236, 239 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). Within these parameters, the trial court is accorded broad discretion to determine whether to empanel an anonymous jury. *See Paccione,* 949 F.2d at 1192; *cf. Maldonado–Rivera,* 922 F.2d at 971 (trial court has broad discretion to undertake security measures to protect jury from harm or intimidation).

■ The record in this case amply supports the district court's conclusion that the jury needed protection. The government's pretrial proffer on this issue, borne out by evidence at trial, indicated that the Green

Dragons had an extensive history of interfering with the judicial process. For example, the Green Dragons murdered Tina Sham and Tommy Mach because Sham had once testified against a gang member, in furtherance of Chen I. Chung's policy of killing witnesses. In addition, after shooting the owner of the Tien Chiau Restaurant in retaliation for his failure to pay for protection, Alex Wong shot at several customers, killing one and paralyzing another, in an apparent attempt to eliminate potential witnesses. When Wong was arrested in connection with the Tien Chiau shootings, the Green Dragons undertook to locate the sole eyewitness to the shootings in order to kill her before she testified. More recently, after Sonny Wong had begun cooperating with the government in this case, Kin Fei Wong, the overall leader of the gang, spoke with other gang members about his attempts to locate Sonny Wong's family in an apparent attempt to use them to coerce Sonny Wong's silence.

The Green Dragons' demonstrated willingness to obstruct justice warranted the use of an anonymous jury, especially in view of evidence that Kin Fei Wong and other members of the Green Dragons remained at large with the means to harm jurors. *See Paccione,* 949 F.2d at 1192–93; *Thomas,* 757 F.2d at 1365. Furthermore, at the time of the government's motion the case had received a significant amount of coverage from the print and broadcast media, and the government reasonably predicted that additional press coverage would accompany the trial. The prospect of publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment. *See Vario,* 943 F.2d at 240.

We also conclude that the district court took adequate precautions to safeguard the defendants-appellants' constitutional rights. Although the district court precluded disclosure of the jurors' names, addresses, and employers, the court questioned prospective jurors about their familiarity with the case, the defendants and the crime scenes, and inquired about their neighborhoods, marital status, employment, spouse's and children's employment, education, organizational affiliations, ethnicity, military service, and other matters. This extensive voir dire adequately explored prospective jurors' "bias as to issues in the case[ ] and as to the defendant[s]," *United States v. Barnes,* 604 F.2d 121, 140 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), and "was more than sufficient to enable the defendants to exercise their challenges meaningfully, and to obtain a fair and impartial jury." *United States v. Tutino,* 883 F.2d 1125, 1133 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 1082, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).

Chan complains that when Judge Raggi told the jurors at the outset of trial that government transportation would be provided to them because of their "anonymous" status, no explanation was provided to allay the jurors' potential concerns about that status. No request was made for such an explanation, so the issue was waived. *See Vario,* 943 F.2d at 241. Further, when the jurors inquired about having to eat lunch in the courthouse when other juries were permitted to go to nearby restaurants, Judge Raggi explained that it would not be possible for twelve jurors and six alternates to be accommodated at restaurants during the one-hour lunch break that she scheduled, without any reference to their anonymous status. These incidents provide no basis to conclude that this status prejudiced the jury's deliberations to the disadvantage of defendants-appellants.

## G. Admission of Evidence of Uncharged Criminal Activities.

During the trial, the government introduced wiretap evidence and live testimony concerning a fight between the Green Dragons and a rival Asian gang, known as Born to Kill ("BTK"), at the Mars Club in Manhattan during June 1990. Sonny Wong testified that he had gone to the club with Danny Ngo, Tung Tran, Brian Chan, Joseph Wang, and several other members of the Green Dragons. Brian Chan and Tung Tran remained outside watching the entrance to prevent other gangs from entering, while the others went into the club. Inside, the Green Dragons encountered BTK members and a fight ensued. During the melee, Wang was

struck in the face with a beer bottle and (along with other Green Dragon members) ran for the exit. Once outside, he retrieved a gun from the gang's parked car and began firing at BTK members as they departed from the club.

Objection was made to the introduction of this evidence on the grounds that it was proof of an uncharged crime, cumulative, and prejudicial. *See* Fed.R.Evid. 403, 404(b). The government countered that the evidence was not cumulative because it "establish[ed] the membership of these individuals in the Green Dragons," and was some of the first evidence admitted concerning Ngo's participation in the enterprise.

The district court ruled that the evidence was admissible to prove the existence and nature of the Green Dragons "enterprise" and the participation of defendants-appellants in that enterprise, rather than as evidence of other crimes under Rule 404(b). The court determined that although other evidence had been admitted regarding the defendants' violent conduct, the challenged evidence was not cumulative because "there is no piece of evidence that the government has proffered that I do not expect will be subject to challenge, if not here during the evidentiary phase of the trial, [then] during summations of counsel." The court then implicitly rejected the defendants' challenge to the evidence under Rule 403, stating that, "I will always listen to objections, because . . . if [the testimony about the fight] gets too far afield, I would limit it under [Rule] 403."

On appeal, Joseph Wang and Brian Chan challenge the admission of this testimony, claiming that it was cumulative and unfairly prejudiced them by demonstrating their propensity to use guns and to engage in gunfights. We disagree.

■ A district court has broad discretion regarding the admissibility of evidence and its rulings will be disturbed only for an abuse of that discretion. *See United States v. Brady*, 26 F.3d 282, 286 (2d Cir.) (collecting cases), *cert. denied,* — U.S. —, 115 S.Ct. 246, 130 L.Ed.2d 168 (1994). No such abuse appears here. Evidence is "relevant" if it has "any tendency" to prove or disprove a fact of consequence in the trial. Fed.R.Evid.

401. As the district court recognized, this evidence was probative of the existence, organization, and nature of the RICO enterprise, a central allegation in the indictment. Accordingly, "the fact that it may also have been probative of a separate uncharged crime is irrelevant." *United States v. Coiro*, 922 F.2d 1008, 1016 (2d Cir.), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *see also Brady*, 26 F.3d at 287–88; *United States v. Clemente*, 22 F.3d 477, 483 (2d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 258, 130 L.Ed.2d 178 (1994).

■ With respect to Rule 403, the district court acted well within its discretion in concluding that the evidence was neither cumulative nor unduly prejudicial. The record reflects that the district court carefully considered the evidence already in the record and reasonably concluded that the existence and nature of the Green Dragons enterprise was not yet so firmly established as to render this evidence surplusage. Indeed, Wang's counsel consistently referred to the organization during cross-examination as the "so-called" Green Dragons, indicating that the existence of the enterprise remained in dispute. *Cf. Brady*, 26 F.3d at 287 & n. 7 (evidence of ongoing war between rival gangs properly admitted because existence of war remained in dispute). Moreover, the wiretap evidence concerning this incident was one of only two intercepted conversations in which Ngo took part, and thus was useful in connecting Ngo to the Green Dragons organization. Finally, we cannot say that the significant probative value of this evidence was "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403.

■ Brian Chan now criticizes the district court for its failure to limit the evidence to omit references to the use of guns (thus restricting the testimony to the initial fistfight). However, Chan never requested that the testimony be limited in this fashion, although he had ample opportunity to do so during a government proffer at a sidebar conference, and this argument must be deemed waived. Judge Raggi explicitly stated that the relevance of this evidence was to

show that "what started as fisticuffs turned into a resort to firearms," and this comment elicited no response or objection from any defense counsel.

## H. *The Murder of Jin Lee Soek.*

 Tung Tran and Brian Chan were both convicted of the murder of Jin Lee Soek on or about February 27, 1990 to maintain or increase their position in a RICO enterprise, the Green Dragons, in violation of 18 U.S.C. § 1959(a)(5). This murder was also a predicate act underlying their substantive RICO and RICO conspiracy convictions. Brian Chan now contends that the court improperly allowed government witness Sonny Wong to present hearsay testimony regarding the murder of Jin Lee Soek. Chan further contends that the evidence was insufficient to support his conviction for the murder. We reject both claims.

Shortly after 5:30 p.m. on February 27, 1990, Peerapol Busapavanij was sitting in the front seat of his car on Ketcham Street in Elmhurst, repairing his seat belts. Busapavanij saw a car drive by him, and saw someone jump out of the car and go down the street. He then heard some shots, turned and saw a man firing a gun, and then saw the same car back up, pick up the gunman, and drive away. When police responded to the scene, they found Jin Lee Soek dead from two bullet wounds to the head. Analysis of gunpowder residue indicated that one of the bullets had been fired from a distance of approximately two feet. Busapavanij had noted the car's license number, and reported it to the police. It was assigned to a 1984 grey Mercury registered to Brian Chan.

Also, a police detective interviewed Danny Kim, a young Korean male and a witness to the crime.

On the evening of the murder, Sonny Wong was standing in the doorway of a shop in Elmhurst when he saw Brian Chan and Tung Tran in Chan's Mercury chasing four young Asian men who ran in the direction of Ketcham Street in Elmhurst. Later that evening, Sonny Wong met Chan, Tran, and other members of the gang at a pool hall. Chan told Sonny Wong that he had spotted members of BTK, a rival gang, in their area and that he and Tran had given chase. Chan told Wong that "he was sitting on the car door and he shot at one of the guys that was running." Later that same evening, Wong had a conversation with Tony Kim, a leader in the Korean Power ("KP") gang. On March 6, 1990, Chan was arrested for the murder of Soek.

At trial, Sonny Wong testified about events surrounding the state prosecution of Chan for the murder of Soek. Wong testified that Chan told him that there was only one witness against Chan in the case, a member of the KP. Wong then began to testify about a subsequent meeting at a restaurant between Tony Kim and a number of KP members and Wong, who was accompanied by a number of Green Dragons members. After a defense objection to the testimony on hearsay grounds, the district court instructed Wong to testify only as to what he had said during the conversation without mentioning what Tony Kim had said, reiterating an instruction given by the court a few minutes earlier. The relevant portion of Sonny Wong's testimony is reproduced in the margin.[6] In sub-

---

**6.** Q: What did you say during the course of this meeting, Mr. Wong?

A: I told Tony Kim that Brian was in jail and that his kid is testifying as a witness against him.

MR. SCHOENBACK: [Chan's trial counsel]: Objection, your honor.

THE COURT: I will allow him to testify to what he said at the meeting.

MR. SCHOENBACH: If I may, I would object on hearsay grounds to what underlies the statement.

THE COURT: Ladies and gentlemen, it is not being received for the truth of the statement, but for the fact that it was said and for whatever

evidence is then adduced as to what follows. Go ahead.

. . . .

Q: Mr. Wong, when you say that his kid was testifying, whose kid are you referring to?

A: Tony Kim's kids [sic].

Q: What else did you say to Tony Kim, Mr. Wong?

A: I told him to tell his kid not to go up and testify.

Q: Did you say anything else to Mr. Kim about that?

A: I told him that he should know the rules involving gangsters going up to take the stand.

Q: What rules are those, Mr. Wong?

stance, Wong testified that he had told Kim that Chan was in jail and that one of Kim's "kids" was going to be a witness against Chan. Wong told Kim to tell his "kid" not to testify; that Kim should "know the rules" that gangsters do not testify against one another; and that after Chan was released from custody, Kim could do "[w]hatever he wants to do" with Chan. After Chan's case was dismissed and Chan was released, Chan told Sonny Wong that "the government had to drop the case because the witness did not show up." Aleck Yim also testified that Chan told him that the person who was "supposed to testify against him disappeared." In addition, a police detective testified that after Brian Chan's arrest, the detective was unable to locate Danny Kim.

■ Chan contends that Sonny Wong's testimony was merely a device through which the prosecution introduced the hearsay testimony of Tony Kim and (via Tony Kim) Danny Kim. Chan argues that although Wong ostensibly testified as to his own statements, his testimony was a transparent attempt to incorporate information supplied by the KP members, and thus constituted inadmissible hearsay under our decision in *United States v. Check*, 582 F.2d 668, 678–86 (2d Cir.1978).

We disagree. In *Check*, the government elicited the testimony of a police detective regarding conversations in which he had engaged with an informant who did not testify. Although the detective did not repeat the words the informant had used, his testimony clearly incorporated "inadmissible hearsay information obviously supplied by and ema-

nating from the informant." *Id.* at 678; *see also United States v. Reyes*, 18 F.3d 65, 69 (2d Cir.1994); *Mason v. Scully*, 16 F.3d 38, 42–43 (2d Cir.1994).

Sonny Wong's testimony, however, did not incorporate any information derived from either Tony Kim or Danny Kim. Wong told Kim what Brian Chan had told Wong, i.e., that a KP member was to testify against Chan. Wong told Kim not to have his "kid" testify, and that Kim could do as he pleased with Chan afterwards. There was no testimony regarding any response by Kim to these remarks. Wong's testimony would have been little different, from an evidentiary point of view, if he had been recounting the contents of a letter he had written to Tony Kim. The significant inference for the jury to draw was not, as Chan contends, that "the witness had already convinced the Korean Power gang that Brian Chan was guilty of the murder." Rather, the relevant inferences were all to be drawn from statements made by members of the Green Dragons themselves.

Significantly, Wong did not tell Kim that Chan did not commit the murder; nor did Chan tell either Sonny Wong or Aleck Yim that he had not committed the crime. Prior to this incident, the Green Dragons were on good terms with the KP, and presumably it would have been in the best interests of the Green Dragons to deny Chan's involvement if they could truthfully have done so. From the absence of any effort to deny the charge, the jury could infer that the Green Dragons, not the KP members, thought that Chan was guilty. Wong's statements about the meet-

A: That we were to take care of ourselves, not to go to the police.

Q: Did you say anything to Mr. Kim about how it could be taken care of?

A: To tell how it could be taken care of?

Q: Yes.

A: I told him to tell his kid not to go up and take the stand, to iron things out, and he would talk to Brian himself.

Q: Did you say anything else about what would happen after Brian came out, Mr. Wong?

A: It's up to him.

Q: Up to who?

A: Tony Kim.

Q: Meaning what? What did you mean by that?

A: Whatever he wants to do.

Q: To whom, Mr. Wong?

A: To Brian Chan.

Q: Approximately how long was this meeting, Mr. Wong?

A: Over an hour.

Q: Did anything happen regarding Brian Chan's case after this meeting?

A: Yes.

Q: How do you know?

A: I went to court with [Brian Chan's] lawyers that day when he—when his case was dismissed.

. . . .

Q: Did you talk to Brian Chan after that, Mr. Wong?

A: Yes.

Q: What did he say to you after that?

A: He told me the government had to drop the case because the witness did not show up.

ing with Tony Kim were thus properly admissible as statements of a coconspirator during the course and in furtherance of the conspiracy. *See* Fed.R.Evid. 801(d)(2)(E). The government's summation underlines this reading of the evidence. The summation made reference only to Wong's portion of the conversation, and did not invite the jury to infer anything from Tony Kim's participation in the conversation.

Chan argues that there was insufficient evidence to support his conviction for Soek's murder because: (1) although the grey Mercury was registered to Chan, other members of the gang had driven the car; and (2) Chan's statement to Sonny Wong that he had been sitting on the door of the car when he shot at the rival gang members was inconsistent with both Busapavanij's eyewitness testimony and autopsy reports indicating that the injuries had been inflicted at close range. We are persuaded, however, that there was adequate evidence from which a jury, drawing all permissible inferences in favor of the government, could rationally conclude that Chan was guilty beyond a reasonable doubt. *See United States v. Chang An–Lo,* 851 F.2d 547, 553–54 (2d Cir.), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988).

Around the time of the homicide, Sonny Wong had seen Brian Chan and Tung Tran speed off towards Ketcham Street chasing a group of young Asian males. Chan's car was identified as the vehicle used by the killer to flee the scene of the murder. Later that evening, Chan boasted about having shot at a rival gang member. Significantly, Brian Chan never told either Sonny Wong or Aleck Yim that he had been wrongly accused and was not responsible for the murder. Finally, Sonny Wong testified to the efforts of Chan and his Green Dragons cohorts to prevent the testimony of a KP witness against Chan regarding the Soek murder, and despite Chan's argument to the contrary, we have concluded that this evidence was admissible against him.

### I. *Downward Departures.*

Chen I. Chung, Roger Kwok, Chiang T. Cheng, and Alex Wong assert that the district court erred in refusing to grant them downward departures. Essentially, Chung, Kwok, and Cheng argue that they were entitled to downward departures because of the lack of guidance they received during their upbringing. Wong claims that the district court erred in rejecting his argument that his case falls outside the "heartland" of the sentencing guidelines for RICO/homicide prosecutions because the Sentencing Commission did not consider the special problems of youth gang members in writing the guidelines. Their claims lack merit.

■ A sentencing court's refusal to depart downward from the indicated guideline sentencing range is ordinarily not appealable. *See United States v. Piervinanzi,* 23 F.3d 670, 685 (2d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 259, 130 L.Ed.2d 179, — U.S. —, 115 S.Ct. 267, 130 L.Ed.2d 185 (1994). This rule does not apply, however, when the sentencing court mistakenly believed that it lacked the authority to depart. *See id.; United States v. Lawal,* 17 F.3d 560, 563 (2d Cir.1994).

■ This court has not recognized "youthful lack of guidance" as a valid basis for downward departure. *See United States v. Haynes,* 985 F.2d 65, 68 (2d Cir.1993).[7] Moreover, the district court explicitly considered granting such a departure to Chang and Kwok, but declined to do so as an exercise of discretion. Although recognizing that such departures might be warranted in some cases, the court found that the hardships suffered by these defendants when growing up were not so severe as to mitigate the murders that they committed. The district court also explicitly declined to grant a downward departure to Chung, but did not specifically advert to any lack of youthful guidance in doing so because that ground was not argued to the court. We are without authority to review the court's decision not to depart downward in imposing these sentences.

---

7. An amendment to the Sentencing Guidelines effective November 1, 1992 (and thus not applicable to this case) explicitly provides that "[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds" for granting a downward departure. USSG § 5H1.12, p.s.

Alex Wong contends that youth gang cases are not within the "heartland" of the RICO statute because youth gang members are more amenable to psychological counseling and rehabilitation than adults. Wong claims that this distinction was not adequately taken into consideration by the Sentencing Commission when formulating the Guidelines, and that his case should be remanded for consideration of whether a downward departure is appropriate in this case. *See* 18 U.S.C. § 3553(b); *United States v. Skinner*, 946 F.2d 176, 179 (2d Cir.1991).

■ We are unpersuaded. The Sentencing Commission has specifically considered age as a factor in sentencing, and has determined that it "is not ordinarily relevant" in determining whether a downward departure is appropriate. *See* USSG § 5H1.1, p.s. Moreover, it is well established that a district court should consider a defendant's potential for rehabilitation in determining a sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(D) (1988). It is therefore unnecessary and inappropriate to carve out a separate "youth gang" exception to the sentencing guidelines for RICO/homicide prosecutions.

■ In this case, the district court explicitly acknowledged that a defendant's potential for rehabilitation was "a factor for consideration" in sentencing. However, the court determined that Wong's prospects for rehabilitation were too speculative to warrant a departure. In doing so, the court carefully weighed the evidence before it, including wiretap evidence in which Wong spoke about "using his psychiatric counseling to his advantage" in sentencing. The district court acted well within its discretion in making this determination.

J. *Imposition of Fines.*

The district court imposed concurrent fines of $250,000 on each defendant for each count of conviction except for Steven Ng, who was fined $175,000.[8] The court imposed these fines despite indications in presentence reports that at least some of the defendants did not have adequate financial resources to pay a fine. In sentencing Tung Tran, the district court explained its rationale for imposing fines on indigent defendants:

Let me say with respect to the fine that at the present time it does not appear that you or most of the defendants in this case are in any position to pay a fine, but because of the serious harm that the victims suffered in this case, and because of my understanding that they can appeal to the attorney general for some kind of dispensation from fines that are collected, I impose a fine. I would not want anyone to buy a lottery ticket, get lucky and then not have to pay the fine, and that's why I impose it.

■ Alex Wong, Brian Chan, and Tung Tran challenge the fines imposed by the district court. They essentially argue that a fine is inappropriate because their presentence reports established that they had no present ability to pay and, because of their sentences to life imprisonment, would not become able to pay a fine at some future time. Defendants-appellants cite this court's decision in *United States v. Rivera*, 971 F.2d 876 (2d Cir.1992), in which we vacated a $17,500 fine imposed on a defendant whose presentence report indicated that he had no ability to pay a fine, but had been interpreted by the sentencing judge as recommending a fine. *Id.* at 895. We remanded for resentencing "[i]n view of the confused state of the record on this issue." *Id.* We also stated that: "If the defendant is indigent, a fine should not be imposed absent evidence in the record that he will have the earning capacity to pay the fine after release from prison." *Id.* (citing *United States v. Seminole*, 882 F.2d 441, 443 (9th Cir.1989)).

The pertinent guideline provisions are USSG § 5E1.2(a) and (f), which provide:

(a) The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.

. . . .

---

8. Chan and Tran erroneously believe that the district court imposed a fine of $250,000 for each count of conviction, for fines totalling several millions of dollars. However, the $250,000 fines imposed on each of them represent the total fine for all their offenses.

(f) If the defendant establishes that (1) he is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine required by the preceding provisions, or (2) imposition of a fine would unduly burden the defendant's dependents, the court may impose a lesser fine or waive the fine. In these circumstances, the court shall consider alternative sanctions in lieu of all or a portion of the fine, and must still impose a total combined sanction that is punitive. Although any additional sanction not proscribed by the guidelines is permissible, community service is the generally preferable alternative in such instances.

 It is clear that a fine may constitutionally be imposed upon an indigent defendant, who may assert his continuing indigence as a defense if the government subsequently seeks to collect the fine. *See United States v. Torres*, 901 F.2d 205, 247–48 (2d Cir.) (collecting cases), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). It is also clear that USSG § 5E1.2(f) authorizes, but does not mandate, the imposition of a lesser fine or waiver of any fine in the case of an indigent defendant. *See* § 5E1.2, comment. (n. 3). In addition, § 5E1.2(a) imposes upon the defendant the burden of establishing indigence, *see United States v. Marquez*, 941 F.2d 60, 65–66 (2d Cir.1991), which may be satisfied either by independent evidence or by reference to the defendant's presentence report. *See Rivera*, 971 F.2d at 895 (citing *United States v. Labat*, 915 F.2d 603, 606 (10th Cir.1990)).

██ Our precedents, however, appear to direct that the discretion vested in sentencing courts by § 5E1.2(f) to waive a fine where indigence is shown should generally be executed in favor of such a waiver. Consistently, we do not believe that these precedents should be read to authorize the imposition of a fine despite a showing of present and future inability to pay, based upon some remote fortuity like the possibility that a defendant will win a lottery. We have already noted our statement in *Rivera* that a fine "should not be imposed" in the absence of some evidence of the defendant's future

ability to pay it. 971 F.2d at 895. In *United States v. Stevens*, 985 F.2d 1175 (2d Cir. 1993), we remanded for resentencing when the district court imposed a $2,000,000 fine despite a presentence report that the defendant was indigent, directing that the district court provide the defendant "an opportunity to come forward with evidence of his inability to pay and ... consider the appropriate factors in determining whether or not to impose a fine and if so, in what amount." *Id.* at 1188. In *United States v. Rivera*, 22 F.3d 430 (2d Cir.1994), while approving the fine imposed in that case, we stated that a "sentencing court may not base the imposition of a fine upon its mere suspicion that the defendant has funds." *Id.* at 440 (citing *Stevens*, 985 F.2d at 1188). On the other hand, an inference that a defendant has funds may be drawn from circumstantial evidence, *see United States v. Orena*, 32 F.3d 704, 716 (2nd Cir.1994), bearing in mind that the defendant must sustain the burden of establishing indigence. *See* USSG § 5E1.2(a).

The proper balance was struck, in our view, by the Third Circuit in *United States v. Seale*, 20 F.3d 1279 (3d Cir.1994). The court stated in that case: "In attempting to predict future ability to pay, district courts must be realistic and must avoid imposing a fine when the possibility of a future ability to pay is based merely on chance." *Id.* at 1286 (collecting cases). The court imposed a fine, however, because the defendants in that "highly publicized crime" might be able to generate future income "from books or movies about [the] crime." *Id.*

██ *Seale* does not provide an entirely satisfactory resolution of the issue, because it appears that the government would be unable to move for an amendment of sentence in the unlikely event that any of the defendants-appellants did win a lottery. *See* 18 U.S.C. §§ 3572(c), 3573. We nonetheless conclude that the district court improperly based one or more of the fines that it imposed in this case upon that possibility. In view of the cross-adoption of appeal arguments by defendants-appellants, *see supra* note 1, we vacate the fines imposed in this case and remand for their reconsideration.

K. *Other Claims.*

The defendants raise a host of other challenges to their convictions. Chen I. Chung contends that the district court: (1) improperly restricted cross examination of Sonny Wong concerning allegedly coercive official conduct in securing Wong's cooperation; and (2) committed reversible error by requesting that the government clarify on redirect examination an ambiguity in testimony elicited during cross-examination.

Danny Ngo contends that: (1) he was a "peripheral defendant" and should have been tried separately; and (2) there was insufficient evidence to support his convictions for (a) conspiracy to murder the leader of the Tung On gang, (b) the robbery of the Hampton Street apartment, (c) the attempted extortion of Jack Tran, and (d) the conspiracy to commit assault upon the White Tigers.

Joseph Wang argues that: (1) there was insufficient evidence to support his convictions for the robbery of the Hampton Street apartment and for conspiracy to rob the Long Island Dumpling Restaurant; (2) the district court erred in admitting an allegedly inflammatory photograph of the crime scene at the Tien Chiau Restaurant that featured a large pool of blood; and (3) there was insufficient evidence to prove that he participated in the Tien Chiau Restaurant murders to maintain or increase his participation in a RICO enterprise within the meaning of 18 U.S.C. § 1959.

Brian Chan contends that: (1) the district court improperly admitted enlarged photographs of the bodies of Tina Sham and Tommy Mach; and (2) there was insufficient evidence to support his conviction for bribing a public official. Tung Tran contends that there was insufficient evidence to support his conviction for the attempted extortion of Jack Tran.

Steven Ng argues that the cumulative impact of the introduction of three pieces of evidence—testimony that he was present at the restaurant where Tina Sham and Tommy Mach were abducted, a recording of an intercepted conversation introduced on the request of Ng's counsel in which Sonny Wong and Ng discussed the Sham/Mach homicides, and testimony (admitted only against Tung Tran) that Tran had threatened Sonny Wong in court—denied him due process of law.

We have carefully considered each of these remaining contentions and find them to be without merit.

### Conclusion

We affirm the judgments of conviction and the sentences imposed in this case except as to the monetary fines. We vacate the fines and remand for their reconsideration.